LUEBKE, Administrator, Respondent, vs. BERLIN MACHINE
WORKS, Appellant.

*October 4 — October 23, 1894.*

*Master and servant: Injury to minor servant: Knowledge of danger:
Assumption of risk: Court and jury: Instructions.*

1. It is a question of fact for the jury whether a minor servant was of
   sufficient age, intelligence, discretion, and judgment to bring him
   within the operation of the rule applicable to adults, by which
   knowledge of open and obvious defects and dangers is imputed to
   them, and they are held to assume the risk incident thereto if they
   continue in the employment.

2. The question in such a case, however, is not what the minor servant
   *in fact* knew or comprehended as to the danger to which he was
   exposing himself, but what he ought to have known and under-
   stood, in view of his age, intelligence, discretion, and judgment;
   and, upon request, the jury should be so instructed.

APPEAL from the Circuit Court for *Rock* County.

This action was brought by the plaintiff, as administrator
of his deceased minor son, John Luebke, to recover dam-
ages sustained by the plaintiff by reason of the death of the
said John Luebke, caused, as it is alleged, by the negligence
of the defendant when he was in its employ; and the
plaintiff obtained a verdict and judgment, from which the
defendant appealed.

The defendant owned and operated a foundry and ma-
chine shop situated on and partly over a mill race along
Rock river, at Beloit. From a platform of the building a
foot bridge extended across the race to the east side of it,
and it was used by those who had charge of the power to
go to and from the shop and foundry to the power house
on the east side of the race. The bridge consisted of three
lengths of planks, supported by piles driven in the race
and cross pieces 2x4 or 2x6 spiked to the piles; and at the
east end and in the middle it was two planks in width, but

at the west end next to the shop and foundry there was but
one plank, about ten inches wide, fastened at the west end
about ten inches below the platform.   The planks were two
inches thick, and at the east end rested on the bank of the
race about one foot above the general level, and there was
no railing along the bridge.   The core room of the foundry,
in which the plaintiff's intestate, with other boys employed
by the defendant, worked under a foreman, making cores
for castings, was about 160 feet south or below the bridge,
and they required and used considerable flour in making
them, which they obtained at a flour mill on the opposite
or east side of the race, about 100 feet above the east end
of the bridge.   There was was a wagon bridge a short dis-
tance below and south of the core room, which was wide
and safe, available to and sometimes used by the boys for
getting flour from the mill.   The evidence tends to show
that they were never directed to go any particular way to
get flour or use the foot bridge, but went either way as
they chose; that the defendant knew of and permitted the
use of the foot bridge by the boys for that purpose; and
that the wheelbarrow they used was an old rickety one,
and not a safe appliance for the purpose of bringing flour
over the foot bridge.   When the boys used the foot bridge
to get flour, they passed from the core room into the
foundry, thence into the machine shop, and thence to the
door opposite the foot bridge, and out upon a platform
upon and over the foot bridge to the flour mill.   When
they went over the wagon bridge below, they passed from
the core room into the foundry, thence into the room next
the core room in the front of the foundry, opening upon
the street, and thence across the wagon or highway bridge
over the race and along the highway up to the mill.   In
returning with a load of flour, they ran the wheelbarrow
up a single plank upon the foot bridge; but at the west end
of it, next the shop, where there was but a single plank,

some one was required to lift the barrow up on the plat-form. It was claimed on the part of the plaintiff, and there was evidence tending to support it, that the bridge was not a reasonably safe passageway for use by the boys in bring-ing flour from the mill to the foundry, more particularly by reason of the manner of its construction and narrow-ness and want of railing, and that the wheelbarrow was not a safe vehicle for bringing flour, but was old and rick-ety, and its use for that purpose was unsafe.

The plaintiff's intestate, about the 15th of September, 1892, of the age of nearly sixteen years, had been in de-fendant's employ for several months from time to time, and then was, and had been since the previous June, at work in the core room, and it was his duty to make cores, attend to the fires, and go after flour, etc. On the day in question he went over to the mill with the wheelbarrow to get flour. It does not appear that he had been specially directed to do so, and no one seems to have seen him until he reached the mill and asked for flour. The miller put a bag of flour on the barrow, and asked him " which way he was going with the flour; if he was going over by the wagon bridge or the foot bridge. He answered he would go by the foot bridge, and I advised him, I told him it was better he would go around by the wagon bridge. He said if he would dump the flour in he would come back and get another sack; that is all that was said. He went on, and I went into the mill." It does not appear that he was afterwards seen alive. The alarm was given that some one was in the race, and he was taken out dead on the east side thereof. The barrow was nearer the east side than the west side of the race, and the evidence tended to show that he must have fallen in about the middle of the foot bridge.

The plaintiff claimed that the bridge across which the boys were required, or accustomed with the knowledge of the defendant, to bring flour in the wheelbarrow, was

dangerous and unsafe by reason of improper and negligent construction, and was an unsafe place for passage by one so young as the deceased; and that the wheelbarrow with which he was furnished was an unsafe and insufficient appliance, as the defendant well knew; and that the defendant negligently omitted to inform or caution the deceased in respect to the use of said bridge and barrow, as it should have done; and that by reason of the premises, and on account of the defendant's said negligence, the said John Luebke tripped, lost his footing and balance, and fell and was thrown into the race, and lost his life by drowning. He left, surviving him, his father, the plaintiff, and his mother, each aged about fifty-five years and dependent in part on his services.

The more material allegations of the complaint were denied by the defendant, and it was claimed, among other things, that the said John Luebke was guilty of contributory negligence in using said bridge and wheelbarrow; that he was of sufficient age, intelligence, and discretion to comprehend the dangers in question to which he was exposed, and that he had knowledge of the same and assumed the risk thereof; that the defects in the foot bridge and wheelbarrow were open and apparent defects.

There was evidence tending to support the various contentions of the parties, and the court, on the part of the defendant, was asked to instruct the jury, among other things, in substance, that "in determining whether the boy was of sufficient age, understanding, and experience to comprehend the dangers to which the use of the bridge for carrying flour as he carried it on his last trip exposed him, you are to consider his age and opportunities which he had to observe the apparent danger of wheeling a barrel of flour across the mill race upon the foot bridge, and to determine from all the facts and circumstances surrounding his death whether or not he was of such an age and under-

standing that, even though he may not have fully appre-
hended it, yet that the danger was so open and apparent,
if you find it to be so, that a boy of his age, experience,
and understanding ought to have known it and ought not
to have exposed himself to it." But the court refused to
so charge. Other like instructions on this point were asked
and refused. The court instructed the jury on the question
of contributory negligence and on the question of assumed
risk, to portions of which exceptions were taken, in sub-
stance, that "a servant must exercise ordinary care for his
personal safety in any employment. He must make a
reasonable use of his senses to avoid injury to himself in
the course of his employment; and if he fails to do so, and
in consequence of such failure he is injured, he cannot re-
cover damages of his master. An employer is not liable
for an injury sustained by an employee where his own
negligence or want of ordinary care contributes materially
to the injury. . . . A servant, on entering a service,
accepts and assumes the ordinary hazards and dangers of
his occupation,— such as are incident to it; and for an in-
jury sustained through such danger he cannot recover. It
is the duty of the employee, without warning, to observe
due care, and any omission to do this is at his own peril.
. . . If an employee, from youth, inexperience, igno-
rance, or want of general capacity, may fail to appreciate
the danger of an employment, it is a breach of duty on the
part of the master to expose such a servant, even with his
own consent, to such dangers, unless he first gives him such
instructions or cautions as will enable him to comprehend
them and do his duty. . . . *The question on this branch
of the case is not of due care on the part of the plaintiff, but
whether the cause of the injury was one of which he know-
ingly assumed the risk,* or one of which, by reason of his
youth and consequent incapacity to understand and appre-
ciate its dangerous character, or the neglect of the defend-

ant to take due precautions to effectually inform him thereof, the defendant is bound to indemnify him for the consequences."

The jury found a general verdict for the plaintiff, assessing his damages at $1,800, and also a special verdict finding, among other things, that the officers and agents of the defendant knew that the foot bridge was insufficient and dangerous for use, but did not inform the boy of such danger; that before attempting to cross the foot bridge at the time in question he was warned or cautioned by Mr. Haase, the miller, to go around another way; that he was *not aware* of the fact that it was dangerous to attempt to cross the bridge with a wheelbarrow loaded with flour, prior to his said attempt; that he did not *knowingly* take upon himself the risk of accident in crossing the foot bridge at the time in question; that the wheelbarrow was not in a reasonably safe condition for the use to which it was put; that the boy was in the exercise of ordinary care at the time he fell from the foot bridge and was drowned; and that he *was not fully aware* of the danger he was subjecting himself to in crossing the race on the bridge with a wheelbarrow loaded with flour. A motion for a new trial, on the ground, among others, that the verdict was contrary to law and contrary to the evidence, was denied.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *E. P. Vilas*.

For the respondent there was a brief by *Winans & Hyzer*, and the cause was argued orally by *E. M. Hyzer*.

Pinney, J. The evidence tends very strongly to show that the dangers to which the plaintiff's intestate was exposed in his service and in crossing the foot bridge with the wheelbarrow loaded with flour, whether arising from the defective and dangerous construction of the bridge or the

use of the worn out and rickety wheelbarrow, were open
and obvious, and that he must have been familiar with the
situation for a period of about three months, during which
he was engaged in the core room, and immediately prior
to the accident.    Had he been an adult, it is difficult to see
upon what ground it could be said that he had not, as a
matter of law, by continuing so long in the service of the
defendant, assumed the risk of injury from those causes,
so that the case ought not to have been submitted to the
jury.    It is well settled that if the alleged defect or ele-
ment of danger is such that, in the exercise of ordinary
care, the servant ought to have observed it and compre-
hended the danger likely to result, then he assumed the
risk if he continued in the employment.    *Haley v. Jump
River L. Co.* 81 Wis. 412, 421, 425; *Dorsey v. Phillips &
C. Const. Co.* 42 Wis. 583; *Ballou v. C. & N. W. R. Co.*
54 Wis. 257; *Goltz v. M., L. S. & W. R. Co.* 76 Wis. 136.
The servant must take ordinary care to observe and ascer-
tain whether any or what dangers are incident to his serv-
ice.    If the defect or danger is open and obvious, knowl-
edge of it on his part will be presumed or imputed to him
as a matter of law; and an adult servant is presumed to
possess ordinary intelligence, judgment, and discretion to
appreciate such danger, so as to regulate his conduct and
avoid it.    Knowledge of the danger, and consent to con-
tinue in the service notwithstanding, is in such case im-
puted to the servant; so that if he subsequently suffers
injury in consequence thereof he has no right of recovery
against the master.    This view is in accordance with what
was held in *Jones v. Florence M. Co.* 66 Wis. 268, 277.    The
same rule applies to the case of an employee who is a
minor, where the defect or danger is open and obvious, in
so far as he is of such age, intelligence, discretion, and
judgment as to enable him to comprehend the situation
and appreciate the danger incident to the work or employ-

ment. Subject to this qualification, knowledge of the defect or danger is to be imputed to him in like manner as to an adult. It is, however, a question for the jury to determine upon the evidence whether a minor servant was of sufficient age, intelligence, discretion, and judgment to bring him within the operation of the rule applicable to adult servants. *Chopin v. Badger P. Co.* 83 Wis. 192. In the absence of proof, it is fair to presume that he possessed these characteristics in the degree usual to persons of his age. Because the question was one for the jury, the defendant's motion for a nonsuit and the request that the jury be directed to find for the defendant were properly denied.

The instruction asked by the defendant, and refused, should, we think, have been given. The consequence of its refusal was that the defendant was denied the benefit of the rule as to imputed negligence and assumed risk, to the extent it was properly applicable to the case, and the case was made to turn, so far as open and obvious defects and danger were properly an element in the case, not upon what the plaintiff's intestate ought to have known and understood, in view of his age, intelligence, discretion, and judgment, but upon what he *in fact* knew or comprehended as to the danger to which he was exposing himself. He was bound to exercise the degree of intelligence, knowledge, and judgment he actually possessed, as much so as an adult, and must be held to have assumed the risk if he exposed himself to a danger which was open and obvious and which he was capable of perceiving and fully appreciating, whether he actually appreciated and comprehended it or not. The general charge does not contain any instruction equivalent to the one asked, and entirely excluded from the consideration of the jury the material question whether the plaintiff, in view of his age, intelligence, discretion, and judgment, ought reasonably to have known

and understood the dangers to which he was exposed in his employment. The effect of this error is indicated by the answers of the jury to questions submitted to them, as above stated.

Other errors were assigned, but, as the questions thus presented may not arise on a new trial, it is not necessary to consider them. For the reasons stated, the judgment of the circuit court must be reversed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.