PETERSON, Administratrix, Appellant, vs. THE SHERRY LUMBER COMPANY, Respondent.

*March 9 — April 3, 1895.*

*Master and servant: Negligence: Assumption of risks: Fellow-servants: Court and jury.*

1. In an action based on negligence, when the facts and circumstances are not ambiguous and the evidence or want of evidence is so clear and decisive that there is no room for two honest and apparently reasonable conclusions, the judge may take the case from the jury.

2. The dangers of working in a sawmill when it was so filled with steam from an incomplete exhaust pipe and from a leak that it was difficult to see to do the work, and when the machinery and rollers were slippery by reason of the condensation and freezing of the steam thereon, were obvious to and were assumed by a skilled workman who continued to work therein.

3. So, also, the risk consequent upon the improper location of the band or guard placed above the saws on an "edger" to prevent boards or fragments from being thrown back, being obvious to a workman experienced in the use of such machines, was assumed by him.

4. The evidence in this case not affording ground for more than a mere conjecture that the alleged negligence and default of defendant caused or contributed to cause the death of plaintiff's intestate, who was killed by a board thrown back from the edger at which he was working in defendant's sawmill, but, on the contrary, tending strongly to show that the accident resulted from the negligence of a fellow-servant, which caused the board to get cramped or pinched on the saw, a verdict for defendant was properly directed.

APPEAL from a judgment of the circuit court for Wood county: CHARLES M. WEBB, Circuit Judge. *Affirmed.*

This action was brought by the plaintiff, as administratrix of the estate of her deceased husband, Peter S. Peterson, to recover against the defendant damages sustained by the death of her husband, caused by its negligence and default, while in the employ of the defendant in its steam sawmill, working at a machine therein called an "edger." The alle-

gations of negligence and default on the part of the defendant were denied, and the defendant alleged that the injuries which the intestate, Peter S. Peterson, received, were caused by his own carelessness, and that his own negligence contributed thereto.

It appeared at the trial that the machine or "edger" at which the deceased worked consisted of two tables, five feet four inches in width, the front one ten feet in length, and the rear one eight feet in length, and between them on a shaft were several saws at adjustable intervals, revolving at a high rate of speed, propelled by the common motive power of the mill. The deceased stood, when at work, at the front end of the front or ten-foot table, facing these saws, which revolved towards him. The rotary saw was back of him and to his right, and the boards to be edged came down from the rotary on a roller frame, so that he could take them and put them on the table of the edger, to be edged in width according to his judgment. Three of the edger saws were movable on their shaft, and adjustable in distance by means of a wheel where he stood, on which there were marks to guide him as to widths, and sometimes he relied upon his estimate of width. The edging of a board, with him, was a matter of judgment. In front of the saws there was a fluted or corrugated roller in the table, and behind them there were two such rollers, fourteen inches apart, all driven by separate belts. Behind the saws, and over two of the fluted rollers, were the pressure rollers, very heavy and designed to hold the board down on the fluted rollers as it passed along over and through the machine. The velocity and power of these rollers carry the board when it comes between them over and through the machine, so that it is edged by the saws. There is a lever with a connection by means of which the deceased could raise the pressure rollers back of the saws when he had occasion to allow thick boards or pieces to go under them; but if the lever was raised while

the board was being edged the board would ride the saw at once and be thrown back and would not saw back. At the rear table there were two men engaged in assisting in the work, one removing the waste or refuse matter sawed from the board, and it was the duty of the other to remove the board after it came through the rollers, and place it on a table called the "trimmer," where it was cut to the proper length. It was his duty to see that the board did not swing around, but not to take off or touch the board until it had passed through from under the pressure rollers. The deceased was an experienced man in the management of such a machine, and had full charge of the machine when in operation, adjusted the saws, and controlled the pressure rollers from his place at the head of the machine. He took each board as brought to him from the rotary, put it on the table in front of him, and pushed it along against the saws until the rollers behind the saws took hold of it and carried it forward until entirely edged, when it passed beyond the pressure rollers.

The deceased was struck in the stomach by the end of a sixteen-foot board which had passed the front edge of the saws and had been edged on both sides. After passing the front edge of the saws it was caught by the upward and onward motion of the saw on the rear side, was sawed back completely, eight or nine feet, when it rode or got on top of the saw, and was thrown back with terrific force and struck the deceased as stated, causing his death. The machine was one in very common use in mills, and had been put in good order, and since then had been run but one day, and, on examination after the accident, it was found in good condition. The evidence tended to show that the riding of the saw by the board was not caused by the raising of the pressure rollers by the deceased before the board had got past the saw, but by the end of the board having been swerved around by Engebrictsen, the man whose duty it

was to take it when edged and put it on the trimmer, or from some other cause. The weather was cold (January 17th), and the mill, after having been overhauled, was started up only the day before.

As ground for imputing negligence and default to the defendant, evidence was given to show:

(1) That the piping of the steam exhaust had not been completed, the pipe running out of the filing room into the open air, and the steam escaped about six feet from the ground, and about eight feet from the side of the mill; that they did not have time to pipe it to the top of the building, as they intended, before starting up; that the engineer told the superintendent that they ought to have held up another half day and got it all fixed, but he said that would be all right; that there were two or three cracks or openings on the south side of the mill where the refuse went, so that when the wind blew from that direction, on account of the way the piping had been left, the steam came back into the mill, but not when the wind was from any other direction; that there was an opening from the boiler room, which was below where deceased worked, into the upper part of the mill, and that the steam dome leaked, and steam escaped from the boiler into the mill. The engineer, Jadack, testified that the steam, before Peterson was injured, was very dense in the mill; that he could not see further than four or five feet so as to make out a person standing that distance. Miller, the foreman, testified that there was something unusual around the mill prior to the accident; that there was lots of steam in the mill — pretty foggy; that the effect of getting a little steam in, that kind of a morning, would be to make it foggy, and usually in most all sawmills there is more or less steam, and it is very hard to prevent it, but it was not as dense at other times as when this accident occurred. Engebrictsen, who worked at the rear of the edger, testified that on the morning before the accident happened

Peterson vs. The Sherry Lumber Co.

the steam was so thick he could hardly do his work; that it would be thinner and thicker at times; that it was all around the edger, and under it, and at times he could not see the frame of the machine on the back table very far. Boudreau, who worked about fifteen feet from the deceased, said the steam was as thick as steam could be; that he could see a form from four to five feet, but not so as to tell whether it was a man or a woman, and on that account all the work that morning was done slowly. The setters testified, substantially, to the same effect, and one of them said that he could not see the signals plain enough to tell what they were. One Haasl testified that he spoke to the foreman about the steam that morning, "that it was dangerous, and he was afraid some one would get killed;" that the foreman replied that he thought so himself, and that "we ought to shut down and fix it up." Miller, the foreman, also testified that there were notches on the wheel near deceased, from which he could set and judge the relative distance of the saws, and about fifteen minutes before the accident the deceased spoke to the foreman and said he could not see the saws; that his conversation was as to the manner of doing the work as it ought to be done, and he said nothing about it being dangerous; that the foreman told him he should do the best he could, and edge the boards as well as he could, until they got the steam stopped; and that it was then pretty foggy.

It was also contended that the steam condensing upon the machine and rollers rendered them less efficient and hindered the men in the discharge of their duties. Engebrictsen, whose duty it was to take the boards from the rear table as they came through from between the rollers, noticed ice on the last or dead roller at the end of the rear table; that the board would slip down, and he could not use the roller on this account, and had to take it out; that he tried to pry the boards on a two by four piece (using it as a ful-

crum) at the end of the table and below the end roller; that there was a kind of ice on the roller, and that he noticed it "because of the board slipping on the roller when I was trying to pry the board over. I had to pry the board over to get it on the trimmer, and when I was prying it on the roller the board would slip down. I put the roller back again, and at the same time heard a crack, and looked up, and I saw the board that injured deceased coming down. I had the roller out at the time; but had it in its place when I heard the crack. I didn't see it going back. I don't take hold of boards until they pass clear through the pressure rollers. The boards would have to go themselves. I didn't have hold of the board. Didn't push it over with the roller in any way that I know. The dead roller at the end of the machine is for the purpose of carrying boards on from the edger, not to aid me to swing the boards off." Petosky, who worked with Engebrictsen at the machine and took away the edgings, testified that he saw a board pass through the edger coming towards Engebrictsen, and that when the board started the latter was putting in the back roller, and had not got it in when the board came along. "He went to put it in, and I saw he had one end up and one end on it, the table, and the board swung and went back. Saw it when it went back and when it started to come out. I turned to shove some edgings off, and when I turned around the board was on the end roller about two feet over the end. Engebrictsen had one end of the roller up, and the other end in, and the board swung and went back. He had both hands on the roller. The board went back fast. When he put the roller back the board had not got out [from between the fluted and pressure rollers]. He had it [the roller] in one hand, but didn't have this end in, and he lifted it up to fix this in. Should judge the board went two feet over the hind roller before it started back. It at first sawed in, and then took a shoot and went clear through. The

rollers had a little frost on, and it was slippery, and the board was frosty, green timber, and it would slip. Engebrictsen lifted the roller up when the end of the board was on it, and had one end in. The board slipped around." Engebrictsen, being recalled, said the steam was so dense around there that it was hard to see; that he did not know if he had the roller in or not before the board got back. "Didn't see a board come over the roller when I had it up. Didn't see the board going back. If it slid on that roller to one side, I don't know, but I didn't push the board. Haven't been sure in my own mind but I had the roller up and the board came up and slid over. Have tried to think over it a good deal. I don't know how it was."

(2) Evidence was given tending to show that there was an iron plate or guard in front of and above the saws, ten inches wide, to prevent a board from coming back, but that it was placed too high above the saws for that purpose; that there was no guard or preventive in the machine to keep a board from riding the saw; that the iron strap or band which was ten inches wide was above the saw, and that it would not prevent a board riding the saw. Evidence was given tending to show that the machine was of a plan in general use, and that the pressure rollers are generally effective for the purpose of preventing a board coming back, and that the strap or band and its location were in plain view of the deceased as he worked at the machine.

(3) There was some evidence tending to show that the dead rollers on the rear table were higher than the fluted rollers, but not how much; that in consequence the pressure would come on the dead rollers before the fluted rollers, and that would assist in allowing the board to come back. But a millwright, who examined the machine after the accident, testified that the dead roller at the tail of the machine was a trifle higher than the fluted rollers, and, laying a straight edge on the fluted rollers and on the dead roller at the rear,

Peterson vs. The Sherry Lumber Co.

the fluted roller was higher than the dead roller next to it, and higher than the two rollers between it and the last, and that the rollers were in his judgment all right. Boudreau testified that the dead and fluted rollers were of the same height. Lewis, one of the manufacturers of the machine, said that the dead rollers at the back should be on a level with the fluted rollers, and if they were an inch or inch and a half or two inches higher it would relieve the pressure rollers of some of their force; that the machine in question had all the approved appliances in such machines up to the time of the accident.

The evidence tended to show that it would take eight or nine seconds for the board in question, sixteen feet long, to pass the saws, and from four to six seconds to saw back the distance of eight or nine feet before it rode the saw; that if the deceased was facing the machine and saw the board start, he would have had time to get out of its way. There was expert testimony tending to show that the board must have been swung around so that it pinched on the saw, and thereby the teeth of the saw revolving back had caught it, and it sawed back until it rode the saw, and that it must have been touched by somebody or something, and that the result would not have occurred without its being pinched; that a saw sometimes springs, and, as it recovers, it draws into the board, and it might be pinched so that the board would come back against the force of the pressure rollers; also, that it would be impossible for a board under the rollers to come back after it had passed the saws, if it was straight and the edger all right; if it did not go through, it must have been swung around so as to pinch, or the saw sprung as it went through; that the snow and ice on the logs would not have affected the rollers, but the boards would be somewhat frosty, as the logs were green, and green lumber was always wet; that, steam settling on rollers and freezing them, they would naturally become icy and

slippery; that it was the edger's place to look out for his machine and know when it was out of order. One who testified as an expert said that the board, sawed back as it was, showed the pressure rollers were down and holding it onto the saw; and when the saw was revolving back its tendency was to throw the board up and onward; that it could not have caught the board if the rollers had been in proper shape, for they were very heavy; that, if the rollers were covered with ice from steam and frost, it would render them insufficient to carry the board through as it ought to go, to the tail sawyer, and so, if the dead rollers were covered with ice, they would all have an effect in preventing the board from going on, and so if the board was wet. One of the manufacturers of the machine, Mr. Lewis, testified that the machines had no arrangements to prevent a board coming back but the action of the pressure rollers and the fluted rollers, and that was deemed sufficient; that if a board goes past the saw with these rollers on, he knew of no way it could be brought back unless it is thrown around against the saw; that the pressure rollers and apron weigh 400 pounds each, and the dead rollers at the back should be on a level with the fluted rollers. If higher, the board would bear on them a little heavier than it ought to. The front guard or plate is to prevent pieces of bark or edging flying back, and for additional precaution against boards coming back.

Other relevant facts are stated in the opinion. After the parties had rested, the court directed a verdict for the defendant, and from a judgment thereon in its favor the plaintiff appealed.

For the appellant there were briefs signed by *Synon & Frost*, attorneys, and *John H. Brennan*, of counsel, and oral argument by *Mr. Brennan*.

For the respondent there was a brief by *Cate, Jones & Sanborn*, and oral argument by *D. Lloyd Jones*.

PINNEY, J.  1. The question to be considered is whether there was sufficient evidence to go to the jury to justify a finding that the negligence of the defendant caused the death of the plaintiff's intestate, and whether, upon the entire case, there was sufficient evidence to sustain a verdict for the plaintiff.  It is well settled that a mere scintilla of evidence or mere surmise of negligence on the part of the defendant would not be sufficient, and that the jury are not to be permitted to guess at or conjecture a result, and thus arrive at a verdict that must be founded on and sustained by competent evidence; and it is the duty of the court to grant a peremptory instruction or nonsuit where the state of the evidence is such that it can clearly see that it would be the duty of the court to set aside the verdict if rendered in favor of the party having the burden of proof.  Thomp. Trials, §§ 2247, 2249, and cases cited.  Negligence is an inference to be drawn from the facts and circumstances disclosed by the evidence, and "when such facts and circumstances, though undisputed, are ambiguous and of such a nature that reasonable men, unaffected by bias or prejudice, may fairly disagree as to the inference or conclusion to be drawn from them, the question should be submitted to the jury; but when the facts and circumstances are not ambiguous, and there is no room for two honest and apparently reasonable conclusions, then the judge may take the case from the jury." But, in order to justify this course, the evidence or want of evidence must be clear and decisive.  *Kaples v. Orth*, 61 Wis. 533, and cases cited; *Valin v. M. & N. R. Co.* 82 Wis. 6; *Hart v. West Side R. Co.* 86 Wis. 484.

Peterson, the deceased, was an experienced operative, and had for some three years been accustomed to the duties of edger which the defendant hired him to perform.  These duties involved skill, experience, and judgment, and a knowledge and familiarity with the machine with which he was working, and these it is presumed he possessed.  He had

Peterson vs. The Sherry Lumber Co.

charge or control of his machine, and it seems to have been his duty to watch and observe it and see whether it was doing its work properly. He was the head sawyer at this machine. By entering upon his employment as an edger, he assumed all the usual and ordinary risks incident to his employment; and if injured by reason of an alleged defect in the machine or an element of danger not usual or incident to his employment, which he either knew or ought reasonably to have known and appreciated, and saw fit, notwithstanding, to continue in his employment, he must be held to have assumed such extraordinary risks as well as the ordinary ones, and no ground of action would accrue in case he was injured in consequence. Particularly is this the case where the defect or danger is open and obvious, and although it exists in consequence of the negligence or default of the employer. All this is in accordance with numerous adjudged cases, and is really beyond dispute. *Dorsey v. Phillips & C. Const. Co.* 42 Wis. 583; *Naylor v. C. & N. W. R. Co.* 53 Wis. 662; *Ballou v. C. & N. W. R. Co.* 54 Wis. 257; *Haley v. Jump River L. Co.* 81 Wis. 421, 426; *Goltz v. M., L. S. & W. R. Co.* 76 Wis. 136; *Luebke v. Berlin M. Works,* 88 Wis. 448; *Showalter v. Fairbanks, Morse & Co.* 88 Wis. 381; *Johnson v. Ashland W. Co.* 77 Wis. 51; *Paule v. Florence M. Co.* 80 Wis. 350.

Where the defect or danger is open and obvious, knowledge of it on the part of the employee will be presumed. In such cases the employer may be said to be guilty of negligence in keeping his premises or machinery in a dangerous condition, and that the servant is guilty of negligence in accepting the service or continuing in it, and it becomes equivalent to contributory negligence on his part. Whittaker's Smith, Neg. 398. An assumption of risk is in fact regarded as a form of contributory negligence. *Darcey v. Farmers' L. Co.* 87 Wis. 249.

Whatever of danger or peril there was in operating the

mill in consequence of the presence of steam in it to an unusual and extraordinary degree, and by reason of a want of proper provision for conveying it away and of the leak in the dome of the boiler, was open and obvious to the deceased, and he must be held to have assumed the risk of the consequent danger and injury. The elements of danger pressed upon our attention are the inability of the deceased, and others working around the machinery, to see so as to perform their work in safety, and the condensation and freezing of the large quantity of steam, rendering the machinery and rollers slippery and unfitting them, it may be, to perform their proper functions. It is certain that the deceased not only could not fail to observe the facts, but the evidence is that he complained of his inability to see so as to properly perform his work, and not that the presence of the steam was an element of danger. His past experience, perhaps, led him to underestimate the danger that seems to have been obvious and great. It appears that the presence of steam at times in considerable quantities in a sawmill is not an unusual occurrence, but it is evident that it was unsafe and imprudent to operate the mill in question under the conditions then existing, when the wind was in a particular direction so as to fill the mill with steam from the incomplete exhaust pipe. He had worked in the mill long enough to know what danger he was encountering, and he made no complaint or protest, but continued in his employment. The effect of the condensation and freezing of steam on the machinery and rollers was equally open to his observation, and so within his knowledge. He must be held to have fully understood the operations of the simplest laws of nature,— that in cold weather condensed steam will freeze and make objects on which it falls slippery. His presumed knowledge from very considerable experience in the use of such machines could not but suggest the effect mentioned upon the machinery and rollers, and the danger likely to

occur from it.   He knew and understood all these things as well and perhaps better than the superintendent or foreman. So, too, in respect to improper location of the iron band or guard placed above the saws to prevent fragments of bark and wood being thrown back, and for additional precaution against boards coming back.   He must have understood its uses, and he could not have failed to observe this defect as soon as he looked at the saws; but it does not appear that he made any complaint or effort to have the defect in the location of the band or guard corrected.   The evidence shows that it is a rare occurrence that a board saws back and rides the saw, and it is claimed that fault ought not to be imputed to him for that reason; but, if not to him, why to the defendant?   It is a question of negligence as to both.   The deceased, on account of his experience in his particular employment, may be properly regarded as a skilled workman, and as having possessed the knowledge and experience incident to his employment.   Upon the plain and uncontradicted evidence, we think the deceased must be held to have waived the negligence of the defendant arising from the causes stated, and to have assumed the risk as to their natural and obvious consequences.

It would seem that the situation would have suggested to a man of ordinary intelligence that the operation of the mill under such circumstances was fraught with danger, not only by reason of his inability to properly work around the machinery, but from the consequences likely to ensue to him by reason of the same inability on the part of others working in immediate connection with him.   A casual glance at the situation on the morning of the accident was sufficient to admonish the deceased of the dangers confronting him in attempting to go on in his employment under then existing conditions.   It was the duty of the employer to take prompt measures to render the operation of the mill reasonably safe and convenient, and it was the right and duty of the de-

Peterson vs. The Sherry Lumber Co.

ceased to consult his personal safety, for if he chose with knowledge, or the means of knowledge, of plain and obvious dangers, to continue to work, he certainly must be held to have assumed the risk of the consequences. The master is bound to observe and perform his duty to his servant, but he is not an insurer of his safety. The servant in the present case was bound to observe and take heed of his surroundings, and to think and consider before exposing himself to menacing and obvious perils arising from the use and operation of the machinery of the mill by himself and fellow-servants, under the conditions disclosed in the testimony, and which the situation would readily suggest to a person of common intelligence.

2. There seems to be a failure of proof to show that the negligence and default relied on were the real and efficient cause of the death of the plaintiff's intestate. There is evidence to show that the board would not have gone back unless it got pinched on the saw; that this would occur if the board, before entirely passing the saws, was swung around so that it cramped on the saw; and also that a board at times will get cramped on the saw and go back, because the saw in its operations may spring to one side and then spring back to its normal position. If the power of the pressure and fluted rollers failed to carry the board through, so that it stopped, they would not have any tendency to force it back against the saws, as they revolve from, and so as to carry the board away from, the saws, unless some one meddled with the board, or some force intervened to turn it aside so that it would cramp on the saw and be sawed back until it rode the saw. There is nothing in the evidence, so far as we are able to discover, tending to show that the pressure and fluted rollers, on the morning in question, or when the accident occurred, had failed in any degree to perform their proper functions, and no evidence even to show that boards came through them slower than usual. On the contrary, the·

evidence is that the board came along in the usual way; that a sudden crack was heard, and the board quickly went back. And there is evidence which strongly tends to show that at that time the tail sawyer was endeavoring to put back the rear roller which he had taken out, and had one end in the proper socket, and was busy endeavoring to put the other end in when the board came upon and over the roller for a distance of about two feet, and, in consequence, was turned or swerved to one side, causing a cramping or pinching of the board against the saw, and that then, in consequence, it went immediately back with the fatal result. The evidence of the man working at the table with the tail sawyer is quite clear and direct, and the evidence of the tail sawyer is uncertain and confused, and does not, on the whole, deny this to have been the case. Although he says he did not touch the board, and did nothing to make it go back, and did not neglect his duties, he says he saw the board coming down; that he did not see how far it came, and did not see it going back; that he did not know whether he got the roller in before the board went back or not; that he had not been sure in his own mind but he had the roller up and the board came up and slid over; "have tried to think it over a good deal since the accident; I don't know how it was;" that when he saw the board coming he "turned around to pick up this roller to put it in place; didn't see the board after that;" that when he heard the crack he had the roller in at one end, and it was not very far from the other. The theory that the board went back for the reason that the pressure rollers did not properly perform their office, is at most conjectural, and this evidence, going to show an adequate cause occurring at the exact time the board started in its backward course, announced with a sharp crack heard by both witnesses, prevents any fair inference that it went back in consequence of any defect in the machine or any negligence or default of the defendant, relied on. Engebrictsen complained of the

Peterson vs. The Sherry Lumber Co.

icy or slippery condition of the rear roller; not that it interfered with the passage of the boards through the machine to prevent them coming to him, but because they slipped or ran over the rear roller and fell down, simply causing him inconvenience, but putting no one in peril. To remedy this, he removed the roller, and the accident was coincident with the attempt to restore the roller when the board was passing through the machine. We cannot see that any inference can be fairly drawn from the slippery condition of this roller, or even of the other two rollers, if such existed, that would justify a finding that it contributed to the accident. The negligence of the fellow-servant of the deceased would seem to have been the cause of the accident, and, as there was no sufficient evidence of any negligence on the part of the defendant co-operating at the time with the negligence of such fellow-servant, it is impossible to see how the plaintiff can recover. If the injury was caused by the springing and consequent pinching of the saw, then it was the result of mere accident, against which, so far as appears, no human foresight or vigilance could guard; and the fact that the rear roller was "a trifle" higher than the fluted rollers, and that this fact had not hitherto interfered with their efficient action, was manifestly so inconsiderable and trifling that it would not of itself afford ground for more than the merest conjecture that it was in any proper sense the proximate or efficient cause of the accident.

For these reasons, we think that the direction of the circuit court to the jury was correct.

*By the Court.*— The judgment of the circuit court is affirmed.