BETHLEHEM IRON CO. v. WEISS.

(Circuit Court of Appeals, Third Circuit. February 16, 1900.)

No. 79.

**1. MASTER AND SERVANT—SAFE PLACE TO WORK.**
The rule that it is the duty of a master to provide his servant with a reasonably safe place in which to work is not an absolute one, but is qualified and limited by the other rule, that the servant assumes all the ordinary risks incidental to the service, so far as those risks at the time of entering upon the service are known to him, or should be readily discernible to a person of his age and capacity, in the exercise of ordinary care, whether

the business is dangerous or not. Such rules do not deprive the master of the right to manage and conduct his business according to his own judgment, even though other methods might be safer; and where the place provided by him for the servant to work is free from dangers which are latent or not obvious, or he has instructed the servant, upon entering his service, expressly as to such dangers, if they exist, he has fulfilled his duty in the premises.

2. SAME—ACTION BY SERVANT FOR INJURY—QUESTIONS FOR JURY.

In the absence of evidence that the danger which resulted in injury to a servant was hidden, or that the servant was misled by the failure of the master to adopt such constructions, methods, or rules as were usual in the business, and which the servant had the right, therefore, to take for granted, until otherwise instructed, it is not proper to submit to the jury the question whether, in their judgment, the place of work was reasonably safe or the rules reasonably proper, and thus make their judgment on these points the test of the master's liability. But where there is a question, arising upon the evidence, whether the danger was obvious, and should have been known to the servant under all the circumstances, or, if not, whether he had been properly instructed, the question of the liability of the master is one for the jury, under proper instructions.

3. SAME—CONTRIBUTORY NEGLIGENCE.

Plaintiff's duties at defendant's iron works required him, about six times during each night, to run a wheelbarrow along a path which passed immediately in front of a doorway through which a narrow-gauge railway track entered the building, on which cars were run by engines at frequent intervals. In crossing the track at a time when the doorway was obscured by steam from an exhaust pipe on one side of it, plaintiff was struck by an engine coming out and injured. He had been working but three nights prior to the accident, and there was evidence tending to show that during that time an engine had come out but once when he was passing, and that on such occasion a boy had preceded it and given him warning. He did not speak the English language, and it was not clear that he had been fully instructed as to the danger. *Held*, that the question of his contributory negligence was properly submitted to the jury.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

For former report, see 88 Fed. 23.

Frank P. Prichard and John G. Johnson, for plaintiff in error.

George Demming and M. H. Todd for defendant in error.

Before ACHESON and GRAY, Circuit Judges, and KIRKPAT-RICK, District Judge.

GRAY, Circuit Judge. This is an action at law by John Weiss against the Bethlehem Iron Company to recover damages for injuries sustained by plaintiff while in defendant's employ. The statement of claim averred that on April 27, 1896, plaintiff was employed by defendant to work as a laborer in defendant's mill; that on April 30, 1896, he was, while in the proper and careful performance of his duties, run over by a car attached to an engine belonging to defendant; and that this accident was due to the fact that defendant put plaintiff to work in a dangerous place, neglected to warn him of the peculiar dangers of the work, and employed incompetent and careless fellow workmen. On the trial it appeared that plaintiff was an adult laborer, 31 years of age, who came to this country from Austria in October, 1895, and, after working in a machine shop and at a metal furnace, applied in April,

1896, to the Bethlehem Iron Company for work. He was given employment at wheeling a wheelbarrow at night, to carry out old loam and bricks and bring in new loam and bricks. Plaintiff spoke German only, but was shown what he was to do by a fellow workman who also spoke German. The portion of the works of the Bethlehem Iron Company in which he was employed consisted of a large building on two sides of a yard. The work which plaintiff was required to do took him along a wheelbarrow path or runway, which crossed a narrow-gauge railway track, upon which ran a dinkey engine and small cars, used in transporting molds from and into the mill. This track emerged from the mill through a doorway 10 feet 8 inches wide, and across the barrow path, the edge of which was 5 feet 7 inches from the wall of the building. Inside of the doorway the track made a sharp curve, so that a person standing in the middle of the track, at the crossing, could only see an approaching car or engine when it was 27 feet away, and a person standing a foot away from the track, before crossing it, could only see an approaching car or engine when it was 19 feet away. There were other tracks of a similar character running into and from the mill, upon which small dinkey engines were constantly running. It is in testimony that an engine, or engine and cars, emerged from this doorway, and across this barrow path, about 40 times during a working night, of 12 hours, or between 3 and 4 times an hour. It was also in testimony that the same rules, customs, and conditions in regard to this doorway had existed for 16 years previous to the accident, and that during that time the wheelbarrows pushed by experienced men over this crossing were frequently struck by the dinkeys, the men themselves only escaping by jumping back. There was some testimony going to show that it was the custom to warn new workmen of the dangers incident to these crossings, and one workman testified that he told the plaintiff to be careful when he crossed the track, or to be careful about the engine. The plaintiff testified that he wheeled his barrow along this path and across this track about six times each night, both ways. The accident happened on the fourth night of his employment, April 30, 1896, about 9:25 p. m. Plaintiff also testified that only once before, during the three previous nights, had his duties taken him by this doorway when the dinkey or engine was coming through. On that particular occasion he testifies that, as he was approaching the track with his barrow, a boy came out through the doorway and said, "Come on," whereupon the engine, which had apparently been standing inside the doorway, came out; that the boy said to him at the same time, "Look out, Hunk." The testimony showed that ordinarily when the engine was coming out it would whistle two long and two short blows for the doorway, but there was no rule requiring it to stop before emerging, or obliging any employé to precede it through the doorway. Another workman testified that there were certain occasions (that is, whenever the dinkey got the molds from the foundry inside the mill) when what was testified to by the plaintiff might occur. It was also in testimony that there were

two other engines employed in the mill in the same manner as the one concerned in the accident, and that they were constantly running in and out, and that there was constant whistling going on,—four blows for another engine, three blows for a curve, four blows for a heat,—and that two long and two short blows meant other things than passing through the doorway, and that these blows were often given near the doorway. It was also in testimony, by a workman employed in wheeling across this track, that it required about two months for a new workman to learn to distinguish these different whistles. It was in evidence that the steam sometimes escaped through the open doorway from the mill into the yard, and that also a large exhaust steam pipe from a stationary engine inside the mill came through the mill wall just at the doorway, and frequently emitted large quantities of steam, which collected right at the crossing. After the accident this pipe was taken from the wall and extended up through the roof. The plaintiff testified that in addition to its being a dark night, in which he could see but a very short distance ahead of him, steam was coming out of this exhaust pipe, and hung in clouds over the crossing, and prevented his seeing anything coming through the doorway; that just before the accident he looked and listened, but heard no whistle, and, with the crossing so obscured by the steam, he pushed his barrow onto the track, where a car, pushed by a dinkey engine, suddenly emerging from the doorway, struck him and caused the injuries complained of. The engineer of the dinkey testifies that he gave the accustomed signal with the whistle, and also that he could not see the crossing from inside the mill or from the doorway. The speed at which the engine emerged is not definitely fixed, the testimony varying on this point from 5 to 11 or 12 miles an hour. The plaintiff testified that he was not told about the doorway and crossing, or warned as to the danger of engines coming out.

There is very little directly conflicting testimony in the record, and the foregoing statement embodies substantially all that is necessary, in regard to the facts, to determine the questions raised before this court. Fourteen assignments of error were filed, and are set out at length in the record. The counsel for plaintiff in error, in their argument before the court and in their brief, confine themselves wholly to the discussion of the questions raised by the seventh to the thirteenth assignments, inclusive. These, they said, they considered the vital questions in the case, and, in order to obtain a distinct decision of them, they expressly waived any decision upon the other assignments. The two important questions raised by the assignments referred to are, as stated in the language of the brief of plaintiff in error:

"First. Whether, in the absence of evidence that the danger was hidden, or that the servant was misled by the failure of the master to adopt such constructions, methods, or rules as were usual in the trade, and which the servant therefore had the right to take for granted until otherwise instructed, it was proper to submit to the jury the question whether, in their judgment, the place of work was reasonably safe or the rules reasonably proper, and thus make their judgment on these points the test of the master's liability.

Second. Whether the court should refuse to give binding instructions for defendant, where the plaintiff's own testimony showed that he contributed to the injury by a failure to take the precautions which the dictates of ordinary prudence, as recognized by all reasonable men, would require."

The tenth and thirteenth assignments of error relate to the first of these questions. The seventh, eighth, ninth, and eleventh relate to the second, and the twelfth, which referred to the refusal of the general request for binding instructions, covers both. The questions here stated are important, and involve the discussion of legal principles which lie at the foundation of the law governing the relation of master and servant. The negligence of the master alleged in the plaintiff's statement, was—First, that the servant was put to work in "an unsafe and dangerous place"; second, that the master neglected to "instruct and warn plaintiff against the peculiar dangers" of the work; and, third, that the master employed incompetent and careless fellow workmen. As to this third ground there was no evidence, and it may therefore be disregarded.

While not attempting to define "negligence," as a legal concept, we may safely say that actionable negligence involves a breach of duty owing by a responsible person either to the public generally or to some particular individual. This makes it necessary that we should consider in the present case the duty owed by the defendant below to the plaintiff below; that is, the general duty of a master to a servant, as applicable to or modified by the special circumstances of the case. Duty and negligence, thus considered, are correlative terms. It is the duty of the master, whether that duty rests upon the terms of the contract of service, expressed or implied, or upon the rules of law governing the situation, to see to it that the servant is exposed to no extraordinary risks which he could not reasonably anticipate. In other words, that there are no risks attending the business other than such as usually attend business of that general nature, or, if there are such extraordinary risks, that they should be explained to the servant, or be known by or be entirely obvious to him. The servant also has the right to expect from the master that his fellow servants have been selected with due regard to their competency and carefulness, and that they are under such proper supervision as the case may require. In this sense, it is the duty of the master to provide for the servant a reasonably safe place to work in, and it is in this sense alone that the duty thus stated is to be understood; otherwise, it would be inconsistent with the well-established rule of law that a servant, upon entering the service of his master, assumes all the ordinary risks incident to the service, so far as those risks at the time of entering upon the service are known to him, or should be readily discernible to a person of his age and capacity, in the exercise of ordinary care, and whether the business is dangerous or not. The law governing the relation of master and servant assumes freedom of contract between them. Much of the world's work is dangerous, and it could hardly be carried on successfully unless those who were employed in it should be held to assume the dangers that were incident to it, or which were known, or so obvious as that they ought to be known, by one enter-

100 F.—4

ing the employment. Latent or concealed dangers known to the master, or which he ought to have known, must be explained by him to the servant. If they are not so explained, such dangers, or those which result from methods of carrying on the business cal-culated to mislead the servant to his peril, are not assumed by the servant as risks of his employment. But the rules of law thus pre-scribing the duty of the master, and the reciprocal undertakings of the.servant, while they limit, do not deprive the master of, the right to manage and conduct his business according to his own judgment; and this is true, even though his methods be more dangerous than others that might be adopted. The so-called rule of a reasonably safe place, in order to be fitted into the structure of the law of mas-ter and servant, must be so limited and qualified by these other rules to which we have been referring, as not to be inconsistent with them; otherwise, it cannot be recognized as a rule of law. It cannot be permitted to sanction the turning over to a jury the de-termination in every case of what is "a reasonably safe place," and thus substitute its varying judgment as to how a business must be carried on, for the lawful judgment of the owner or manager, who may have performed his duty in the premises, as prescribed by the well-established rules of law adverted to. With the possible exception of some extreme conceivable cases, the master, who has conformed to these rules of law, has performed his duty as to fur-nishing a safe place for the workmen to work in, even though it may be more dangerous than it might be made to be. To use the lan-guage of the supreme court of Pennsylvania, in considering the duty of a master in furnishing machinery and appliances with which to work:

"Juries must necessarily determine the responsibility of the individual con-duct, but they cannot be allowed to set up a standard which shall, in effect, dictate the customs or control the business of the community." Titus v. Rail-road Co., 136 Pa. St. 618, 626, 20 Atl. 517, 518.

We have not overlooked the fact that it seems to have been fre-quently held by courts in the United States, as describing an abso-lute duty, that the master is bound to furnish a reasonably safe place for the servant to work in. In these cases it will often be found that the court has qualified and limited this proposition by the statement of those other rules governing the relation of master and servant, with which, as an absolute proposition, it would be inconsistent. However this may be, we cannot agree that there is such an absolute rule of law. Its assertion is out of harmony with the philosophy of this branch of our jurisprudence, and is not sup-ported by the latest decisions of the supreme court of the United States, and is rejected by the ratio decidendi of well-considered de-cisions of the state courts. The master who has furnished a place to work in, free from nonobvious or latent dangers, or has instructed his servant, upon entering his service, expressly as to these, if they exist, has used the due care which the law prescribes as his duty in the premises. The views here stated are in conformity with the decision of the supreme court of the Uni' I States in Tuttle v. Rail-way, 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114. A brakeman was

ordered to couple cars on a track which had a curve so sharp that the drawheads of the cars slipped by each other, bringing the sills of the cars on the inside of the curve in contact, whereby the brakeman was injured. It was claimed that these conditions rendered the place an unreasonably dangerous one in which to work. The court below directed a verdict for defendant. In affirming this judgment, Mr. Justice Bradley, delivering the opinion of the supreme court, said:

"We have carefully read the evidence presented by the bill of exceptions, and, although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less, that it should be left to the varying and uncertain opinions oɪ juries to determine such an engineering question. For analogous cases as to the right of a manufacturer to choose the kind of machinery he will use in his business, see Richards v. Rough, 53 Mich. 212, 18 N. W. 785; Hayden v. Manufacturing Co., 29 Conn. 548-558. The interest of railroad companies themselves is so strongly in favor of easy curves, as a means of facilitating the movement of their cars, that it may well be left to the discretion of their officers and engineers in what manner to construct them for the proper transaction of their business in yards, etc. It must be a very extraordinary case indeed in which their discretion in this matter should be interfered with, in determining their obligations to their employés. The brakeman and others employed to work in such situations must decide for themselves whether they will encounter the hazards incidental thereto, and, if they decide to do so, they must be content to assume the risks."

In Osborne v. Coal Co., 71 N. W. 814, the supreme court of Wisconsin took the same ground. In this case the plaintiff's decedent was injured, while in the employment of the defendant, loading coal into cars from the defendant's coal dock, in the nighttime, by being run over by an empty car which was being let down to the place of loading in the usual manner, but with more than the usual speed. Cars were constantly coming and going on parallel tracks, and the plaintiff, in going to the place where he was to work, passed between the rails of one of the tracks, to avoid danger from falling coal, and, at the point where he was injured, steam from a portable engine enveloped him and obscured his vision. The court said:

"The general ground on which a right of recovery is claimed is the failure of the defendant to provide a safe place for the plaintiff's decedent to do his work. It does not appear how long experience the decedent had had at the employment at which he was engaged. But he was an adult man, and must be presumed to have known and appreciated all such risks of the employment as were open and obvious to a man of ordinary apprehension. Jones v. Mining Co., 66 Wis. 268, 28 N. W. 207; Luebke v. Machine Works, 88 Wis. 442, 60 N. W. 711; Klatt v. Lumber Co., 92 Wis. 622, 66 N. W. 791. He is deemed to have assumed the risk of all such dangers of the employment as he either knew, or could have discovered by the exercise of reasonable attention. Such risks he fails to appreciate at his own peril. As against him, the defendant had the right to carry on its business in such place and manner and with such appliances as best suited its choice or interests, even if some other would have been safer, so that it did not violate the law of the land, nor expose him to dangers which he did not know, and could not learn by the exercise of reasonable attention. Casey v. Railway Co., 90 Wis. 113, 62 N. W. 624, and cases cited; Guinard v. Knapp, Stout & Co. Company (Wis.) 70 N. W. 671. That this was not a safe place to work in was obvious to any man of ordi-

nary apprehension. This the plaintiff's decedent could not fail to appreciate if he gave the situation even slight attention. That there was need of constant circumspection, in order to avoid obvious dangers, is manifest. Cars are coming to be loaded at all times of the night. They came without warning of bell or whistle."

See, also, Manufacturing Co. v. Johnson, 60 U. S. App. 661, 32 C. C. A. 309, 89 Fed. 677; Olson v. McMullen, 34 Minn. 94, 24 N. W. 318; Goldthwait v. Railway 'Co., 160 Mass. 554, 36 N. E. 486; Collins v. Car Co., (N. H.) 38 Atl. 1047.

This brings us to the consideration of the charge delivered by the court below to the jury, and to the exceptions thereto, which are the ground of those assignments of error to which our attention has been confined by the argument of counsel for plaintiff in error. The two questions which arise upon those assignments have already been stated. The first sets out clearly and sharply the principal point upon which the criticism of the charge delivered by the court below is hung. It is this: In the absence of evidence that the danger was hidden, or that the servant was misled by the failure of the master to adopt such constructions, methods, or rules as were usual in the trade, and which the servant, therefore, had the right to take for granted until otherwise instructed, was it proper to submit to the jury the question whether, in their judgment, the place of work was reasonably safe or the rules reasonably proper, and thus make their judgment on these points the test of the master's liability? It is apparent, from what has been said, that this question would have to be answered in the negative, if the conditions on which the question is predicated were assumed, and if the submission by the judge to the jury consisted only of the single proposition stated, without qualification, and without placing before them the law in its entirety, so far as applicable to the facts in the case. It is a universally accepted rule that, in reviewing the charge made by a judge to a jury, the whole charge must be taken together, and its effect as a whole upon the minds of the jury must be considered, when determining whether it contains reversible error or not. The charge is an elaborate one, and deals in a most thorough manner with the law applicable to the case in hand. A careful consideration of it convinces us that, as a whole, it was not unfair to the defendant below. On the contrary, in view of the evidence, and of the undisputed facts of the case, as disclosed in the record, the charge was as favorable to the defendant as the facts would warrant. It is true that the learned judge did submit to the jury the question whether or not the defendant had furnished a reasonably safe place for the plaintiff to work in. If this had been the substance of the charge, without qualification or explanation, it would have been reversible error. But this was not the case. This question was inseparably connected by the learned judge with the question whether or not the plaintiff had received adequate instruction from his employer as to the peculiar risks of his employment, and with the further question whether, if such instruction had not been given, the risks were obvious ones, and such as were appreciated, or as ought to have been appreciated, by the

plaintiff.  The effect of the whole was that the jury were given to understand by the court that if the plaintiff had received full instructions as to the perils of his employment, or if those perils were obvious to the discernment of an average man, and such as were, or ought to have been, appreciated by the plaintiff, he could not recover, no matter how unsafe the work or its surroundings might have been.  A quotation from the charge will render this apparent.  As we have said, the charge is a very full one, covering all the points raised by the evidence, but it is only necessary to advert to that portion of it which touches the question here under discussion.  After giving the jury a general definition of "negligence," and stating to them the necessity that the plaintiff should affirmatively establish not only the "occurrence of a harm-inflicting accident, but also that it was caused by the defendant," the learned judge proceeds to say, among other things:

"Furthermore, a man may be as negligent as he chooses to be in the conduct of his own business or affairs, provided he does not violate any duty which he owes either to the public at large or to some determinate person; and this is recognized in, and is practically conceded by, the plaintiff's statement, to which I am now referring, for, in addition to what I have already read from it, it asserts that the defendant violated certain duties which it is claimed were owing by the defendant to the plaintiff, in that the defendant put the plaintiff to work in such an unsafe and dangerous place, and neglected to instruct and warn plaintiff against the peculiar dangers incident to the kind of work at which he was engaged, and employed such incompetent and careless workmen, that on the night of April 30, 1896,—the fourth night after said plaintiff had been employed by said defendant,—plaintiff was struck, knocked down, and run over by a small gondola car attached to a dummy engine owned and controlled by defendant, whereby plaintiff was injured," etc.

It is not without significance in its bearing upon the position we have taken in this case that the plaintiff, in stating in his declaration the negligence of defendant which constituted the cause of action, puts it as referred to in the foregoing extract from the judge's charge; that is to say, that the plaintiff was put to work in a dangerous place, and that the defendant neglected to instruct and warn plaintiff against the peculiar dangers incident to the work in which he was engaged.  The charge of negligence presumably rested upon both branches of this statement, the first not being sufficient without the second.  In explaining the law relating to this allegation of negligence, the learned judge proceeds as follows:

"First, it is the duty of an employer to provide a reasonably safe place for his employés to work in, but it is not his duty to provide an absolutely safe place, or to adopt and promulgate rules which would insure safety.  Mankind has not been endowed with foresight adequate to meet any such requirement, and accidents may happen in the best-regulated industrial families.  The true question, therefore, is not whether an absolutely safe place or absolutely safe rules were provided, but whether the place, in connection with the rules, if there were any, or without rules, if there were none, was reasonably safe.  I suppose no one would doubt that a crossing at grade on a track on which a locomotive runs must always be more or less dangerous, and this, I think, Mr. Wolle, in substance, said in giving his testimony; but still the question recurs, was this crossing reasonably safe?  Now, there is some conflict in the evidence, as I remember it, as to whether the plaintiff was instructed to use the path nearest to the doorway from which the engine emerged, or a more distant one, or as to whether he was not left at liberty

to choose. But, waiving that question, which is one of fact, and therefore for you, and for the present purpose assuming that the plaintiff was rightly passing over the track at the point where the accident occurred, yet I say to you, upon the question as to whether that crossing was a reasonably safe one, that it is your duty to consider all the circumstances, including the exigencies and requirements of such a business as the defendant was engaged in, and with respect to which it, of course, had the right to exercise its own judgment, provided it did not subject its employés, without warning, to dangers which were not obvious and appreciable by them. * * * I charge you that while it is the duty of an employer to instruct an inexperienced man whom he takes into his employment respecting dangers and sources of dangers which are not open and obvious, it is not the duty of an employer to warn any man of full age of dangers which are apparent, and may be seen and appreciated by himself. Of all such dangers the employé himself takes the risk. He assumes the ordinary hazards of his employment. This is a well-settled principle of the law, and it is a just and necessary one. An iron mill cannot be made as safe as a church. The nature of 'the work to be done, and the mechanism and appliances which must be operated, are, of course, more or less inherently dangerous; and manufacturing enterprises would scarcely be undertaken by rational men if the law of the land charged them with liability for every mischance that might arise in pursuing them. Nor can an employé support an action against his employer upon the ground that he was not informed of any peculiar danger, if in point of fact he had in any manner acquired a knowledge and understanding of that danger before being hurt. Therefore, upon this branch of the case, your first inquiry will be as to whether the defendant was not in fact warned or cautioned respecting the danger from which his injury resulted. If you find that he was, that, of course, will be the end of the matter; but, if you should find that he was not so cautioned, then, in view of all the facts in the case, it will be for you still to say whether or not the conditions at and surrounding this crossing, and incident to its use, were not so open and obvious that an ordinary man could readily perceive and understand the risk to him which they involved. If you find that he could, omission to give warning would be unimportant. If, on the other hand, you should find that warning was not given to the plaintiff, and that the conditions at and surrounding this crossing and the use of it, and the subsequent danger, would not be obvious to an ordinary man of mature age, then you will still further inquire whether or not, in point of fact, the plaintiff had not acquired the needful knowledge and understanding prior to the occurrence of the accident. If he had, then, also, the existence or nonexistence of warning or caution would be immaterial, and the failure to give it, if it was not given, would not entitle the plaintiff to recover."

We do not think that the language excepted to by plaintiff in error, when taken in connection with the very full and correct statement of the law which followed and accompanied it, amounted to a bald submission to the jury of this question, to be determined by their uncontrolled discretion, as to whether the place where plaintiff undertook to work was a reasonably safe place or not. We do not think the jury could have been misled into thinking that it was such a submission. The learned judge, not only in the passages quoted, but in his specific answers to the points upon which he was asked to charge, emphasized the correct view of the law; and, with the exception noted, the defendant could hardly have expected the case to be more strongly put in its favor than it was put by the charge as a whole.

An attentive reading of the testimony contained in the record compels the conclusion that there was ample ground for the jury to find, under the instructions of the court, that the plaintiff, who entered the service only three days before the accident, and was

employed at night only, was exposed to a danger that was not obvious, and of which he had not been distinctly warned by the defendant. It is in evidence, and not disputed, that the dinkey engine, with cars attached, darted through the door of the mill, and across the barrow path where defendant was hurt, at irregular intervals all through the night, without any warning being given of its approach, except the sounding of the whistle just before it emerged from the door, and which, it is in testimony, was like other whistle signals constantly given inside the mill by other engines. While this constituted a danger of which a man long employed might be well aware, and be thus put upon his guard, it does not follow that one employed for so short a time as plaintiff,—a foreigner not speaking the language,—would know and appreciate, or ought to know and appreciate, the peril to which his employment subjected him, without special instructions in regard to it. Furthermore, there was evidence which was entitled to have great weight with a jury in this connection. The plaintiff testified that, during the three nights that he had been so employed, he had only seen the engine come through this doorway once, and on that occasion, a boy preceded it, calling back to the engineer to "come on," and telling him (the plaintiff) to "look out." This was important testimony, and the jury may well have found that the plaintiff, under all the circumstances, was misled as to the rule governing the passage of the engine through the door. In the absence of evidence to the contrary, he not only had a right to assume that his employer would, by proper rules and orders, protect him from unseen perils, but in this case he was justified in thinking that he had evidence that such a protecting rule existed, upon which he could rely when performing his assigned work at that place. There was no evidence that any such rules or precautions had been provided by the defendant. If they had not been so provided, it seems clear that it was a duty owed by the defendant to the plaintiff, under the circumstances disclosed by the evidence, to so inform the plaintiff that he might not be misled as to the situation, and might guard himself accordingly.

It was in testimony, also, and not contradicted, that there was at the doorway the exhaust pipe of a stationary engine, which at frequent intervals emitted clouds of steam, so as to obscure the opening; and the plaintiff testifies that on the occasion of the accident a cloud of steam did envelop the crossing, and through it he pushed his barrow without stopping to look, or being able to see if he had looked. On this ground, in connection with the other facts in the case, the second question raised by the plaintiff in error on the exceptions has been urged before this court; and that is, that the court should have given binding instructions to the jury for defendant, where the plaintiff's own testimony showed that he contributed to the injury by a failure to take the precautions which the dictates of ordinary prudence, as recognized by all reasonable men, would require. In view of what has been said in regard to the facts in the case, we think the court was right in submitting the question of contributory negligence to the jury.

"A case should not be withdrawn from the jury unless the conclusion follows, as matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish." Railway Co. v. Cox, 145 U. S. 593, 606, 12 Sup. Ct. 905, 909, 36 L. Ed. 829, 833. It was for the jury to say whether or not there were excusing circumstances to explain plaintiff's conduct in crossing the track when the doorway was obscured by steam. The danger in crossing under these circumstances was little different from that in crossing in the absence of the obscuring steam. In either case an engine darting through the doorway within five feet of the crossing, without warning of its approach, would constitute a grave peril to one on the track at that point; and it was for the jury to say whether plaintiff had not a right to rely, under all the circumstances, upon the result of his observation on the only other occasion on which he had seen an engine emerge, that someone would precede it, to give warning of its approach. The plaintiff, in his testimony, says that he was looking and listening for this man just before he crossed the track. We repeat the language of this court in the former case between the same parties:

"The 'stop, look, and listen' rule, regulating the conduct of a traveler upon a highway when about to cross a railroad track, is not the criterion by which to determine the degree of care which was incumbent upon the plaintiff. The difference between an ordinary railroad, traversed by trains running at high rates of speed, and the defendant's private railway, in structure, equipment, location, and use, is so great that the general rule governing the crossing of the former is not applicable to the latter."

The plaintiff in error certainly can have no objection to the terms on which the court below submitted the question of contributory negligence to the jury. Its objection is that it was submitted at all, without a peremptory instruction in favor of the plaintiff in error.

We are of opinion that there was no reversible error in the charge of the court below, in respect to the questions raised by the exceptions hereinbefore discussed, and to which the plaintiff in error has confined itself in the argument. The judgment of the court below is therefore affirmed.