# CASES DETERMINED

AT THE

# August Term, 1900.

RENNE, by guardian *ad litem*, Respondent, vs. THE UNITED
STATES LEATHER COMPANY, Appellant.

*April 10 — September 25, 1900.*

*Master and servant: Personal injuries: Evidence: Negligence: Proxi-
mate cause: Instructions to jury: Assumption of risk: "Precise
danger:" Verdict: Contributory negligence: Excessive damages.*

1. In an action to recover for personal injuries sustained by a six-
teen-year-old boy while in the defendant's employ, it appeared,
among other things, that at defendant's plant a side track, separat-
ing two of its buildings, was crossed by a steam pipe which con-
nected such buildings; that such steam pipe was three feet and ten
inches above the top of an ordinary freight car, and two feet and
nine inches above the top of the car in question, and that plaintiff,
who was assisting defendant's engineer to switch a car to a point
beyond the steam pipe, had climbed to the top of the car to set the
brakes, when he was struck in the back by the steam pipe, knocked
from the top of the car, and injured. *Held*, that it was not error
to admit, against objection, evidence tending to prove that the
steam pipe in question might, at small cost and without injury to
its efficiency, have been raised so as not to interfere with em-
ployees riding on top of freight cars.

2. Where the evidence in such case was sufficient to support a finding
of the jury to the effect that, by placing the steam pipe so near
the top of such cars, the defendant made it unnecessarily hazard-
ous for its employees riding on the tops of such cars, it was not
error to submit to the jury, in the general charge, the questions
whether the defendant was in the exercise of ordinary care in
locating its steam pipe where it did, and, if negligent in that re-

gard, whether such negligence was the proximate cause of the injury.

3. Plaintiff had worked as an errand boy for defendant about six months before the injury complained of, and had helped defendant's engineer do the braking on cars switched to its buildings, but had never worked around machinery of any kind. The car upon which plaintiff was riding was being pushed rapidly up a grade and he had climbed on top to set the brakes when it reached a platform 120 feet beyond the pipe where the grade was still ascending. He had passed under said pipe, on box cars, eight or ten times before, on other tracks, which had no up grade, but never on the top of the cars, and had passed under the pipe on the track in question only two or three times, and then when going to points beyond the platform, where there was no up grade. His back was towards the pipe, and he did not think of it, though he knew it was there. He did not know how high above the ground or the cars the pipe was, or that the car on which he was riding was higher than an ordinary car; and had never been cautioned about the pipe, or the care to be used in going under it. *Held*, that the questions whether the plaintiff appreciated, or ought to have appreciated, the precise danger of riding upon the top of the car while passing under the pipe, and whether the plaintiff was guilty of contributory negligence, were for the jury.

4. In such case it was not error to charge the jury, that "you should not only consider that he knew the pipe was there, and that if he collided with it he would be injured, but you should inquire whether he appreciated, or ought to have appreciated, the *precise danger*—the relation of the pipe to the track, to the box car, and its distance from the box car, and the danger of passing under on such a car,"— the effect of the words " precise danger " being to call the attention of the jury to the particular danger of the plaintiff being knocked off the car by the pipe, as distinguished from dangers generally by reason of working in defendant's yards.

5. Nor was it error to instruct, in substance, that if the jury should find that the nearness of the pipe to the car was a danger to which plaintiff was exposed in the performance of his duty, and was a danger which was known and comprehended by him, or was so open or obvious that, considering his age, intelligence, experience, judgment, and discretion, he ought, in the exercise of reasonable care, to have known it, then he assumed the risk.

6. In such a case there was evidence showing that plaintiff had received general instructions about switching and coupling cars, and defendant's engineer testified that he had warned him to

keep off from the tops of cars while in motion, which testimony was flatly contradicted by plaintiff. *Held*, that a finding that plaintiff had not been warned to keep off the tops of cars while passing under the pipe in question was supported by the evidence.

7. Plaintiff, a boy sixteen years of age, was injured so that amputation of one arm was necessary, and the other dislocated at the wrist and elbow and so broken and injured that its use was permanently impaired. He suffered much pain, though able to be about in four or five weeks after the injury. He received an injury to the head and had difficulty in passing urine, which might be due to some local cause or an injury to the spine or brain. Prior to the injury he was healthy and was receiving $1 per day. *Held*, that a verdict for $20,000 ·damages was largely in excess of what was warranted by the law and the evidence, and that a new trial should be granted unless plaintiff remitted all damages in excess of $12,000.

8. MARSHALL and BARDEEN, JJ., dissenting, are of the opinion that the evidence showed that the danger which menaced the plaintiff was so open and obvious, and so well known to him, that it should be said, as a matter of law, that he assumed the risk of accident.

APPEAL from a judgment of the circuit court for Clark county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Cate, Sanborn, Lamoreux & Park,* and oral argument by *G. W. Cate* and *R. J. MacBride.*

For the respondent there was a brief by *Spencer M. Marsh,* attorney, and *Olin & Butler,* of counsel, and oral argument by *John M. Olin* and *Harry L. Butler.*

The following opinion was filed June 21, 1900:

CASSODAY, C. J. This action was commenced February 17, 1899, to recover damages for personal injuries sustained by the plaintiff October 8, 1897, while in the employ of the defendant, and riding upon the top of a freight car, for the purpose of setting the brake thereon, while being backed into its yards, by being swept from the top of the car by an exhaust pipe extending horizontally from its boiler house to its beam house, over its side track or tracks, and

Renne vs. The United States Leather Co.

thereby thrown down under the car and injured.   The de-
fendant answered by way of admission, denials, and coun-
ter allegations.   Among other things, the answer admitted,
in effect, that the defendant was a corporation duly organ-
ized and existing under and by virtue of the laws of New
Jersey, having its principal office of business at New York;
that at the times mentioned it operated a tannery in the
city of Stanley, in Chippewa county, Wisconsin; that its
plant consisted of several buildings, among which were
two buildings located a considerable distance apart, and
respectively known as the beam house and boiler house;
that at a considerable distance from the two buildings, and
easterly therefrom, were located the railway tracks of the
Wisconsin Central Railway Company; that the defendant
owned and operated side tracks extending from the Wis-
consin Central Railway tracks to such plant; that one or
more of the side tracks passed between the beam house and
the boiler house; that the defendant also at the time owned
and operated an engine, with which it propelled to its
plant, over its side tracks, such cars of freights as might be
shipped to it over the Wisconsin Central Railway; that
during all the times mentioned the defendant maintained
two steam or exhaust pipes, extending horizontally from
the boiler house to the beam house, over such track or
tracks, which passed between those buildings; that for a
short time prior to October 8, 1897, the plaintiff was in the
employ of the defendant at such plant as messenger or boy
of all work, as should be required of him; that by reason
of such employment it became and was the duty of the de-
fendant to provide him a reasonably safe and suitable place
in which to perform the duties required of him, and to warn
him of any danger incident to the performance of such du-
ties, and also not to expose him to unnecessary or unusual
hazards; that October 8, 1897, the plaintiff climbed to the top
of a car, then being moved upon such side tracks, and then

Renne vs. The United States Leather Co.

being moved over one of such side tracks, which passed between the beam house and the boiler house, by direction of the engineer of the defendant then in charge of such engine; . that such car was pushed or kicked westerly by such engine, in charge of such engineer, and passed under the lower steam or exhaust pipe; that the plaintiff, being upon the top of the car, was knocked off the car, and between the car and the engine, and was run over by the engine, and by reason thereof sustained the injuries set forth in the complaint; that the car upon the top of which the plaintiff so climbed was of greater height than ordinary freight cars, but that cars of such height and of different heights were frequently handled by the defendant at its plant; that it had no knowledge or information whether the plaintiff had knowledge of the height of the car, or of the proximity of the lower pipe to the top thereof; that the plaintiff received the injuries complained of and set forth in the complaint by reason of being thrown or knocked from the top of the car as set forth in the complaint; that August 31, 1898, the plaintiff caused to be duly served upon the defendant a notice in writing of such injuries, etc., as required by the statute. And the answer alleged that all such injuries sustained by the plaintiff were suffered by him solely through and by means of the carelessness and negligence of the plaintiff, and not otherwise.

At the close of the trial the jury returned a verdict in favor of the plaintiff, and assessed his damages at $20,000. From the judgment entered thereon for that amount and costs, the defendant brings this appeal.

In addition to the facts thus admitted in the answer, it appears from the evidence, and is undisputed, that about 270 feet east of the exhaust pipe in question was the west end of the defendant's office, with the scales under the main track, just north of it; that thirty-nine feet west of the office was a switch to a side track coming from the west, along the north

side of the boiler house and the bark mill, into the main track; that twenty-six feet north of the office was the beam house running east as far as the office, if not further, and west to a point a few feet west of the exhaust pipe in question; that the beam house was north of all the tracks, and 321 feet in length; that a side track came in from the east, and ran along the southerly side of the beam house, toward the west, and into the main track, about 190 feet west of the office; that forty-eight feet east of the exhaust pipe was a switch, where the hide-house side track came from the west into the northerly side of the main track; that from the exhaust pipe west on the hide-house track, 120 feet, was a point opposite the center of the acid or chemical platform,— a platform twenty-seven feet long; that the grade from the west end of the scales or office to the hide-house switch ascended towards the west at the rate of about one foot in every 100 feet; that from that switch to the chemical platform it ascended at the rate of about two feet in every 100 feet. It is stated, in substance, by the defendant's attorneys that the freight car in question (No. 10,216), loaded with acids belonging to defendant, was on the Wisconsin Central tracks; that the defendant's railroad engineer, Payne, with the defendant's engine and the plaintiff, went after that car on the day of the accident, the plaintiff riding on the engine with the engineer; that when the car was reached the plaintiff got off from the engine and coupled the car to the engine, and then got onto the engine again; that the car was then taken to the scales, and the engine uncoupled from the west end of the car and recoupled to the east end of the car; that it was then pushed to the place of unloading at the chemical platform; that the hide-house switch, forty-eight feet east of the exhaust pipe mentioned, was opened by the plaintiff to let the car and engine out from the main track onto the hide-house track; that the plaintiff knew that the car was to be pushed

by the engine onto that track and under the exhaust pipe to the chemical platform, to be there unloaded; that after opening the hide-house switch, and when the car started to go upon the hide-house track, the plaintiff, without the knowledge of the engineer, Payne, climbed up the side ladder at the northwest corner of the car to the top thereof, and then walked eastward toward the east end of the car; that in doing so his back was toward the west,— toward the exhaust pipe,— the car being in the meantime pushed toward the pipe as fast as a man could walk (the plaintiff testified, as fast as a man could run); that the plaintiff continued to face the east, with his back towards the pipe, west of him, until the car went under the pipe, and he was struck by the pipe across the shoulders, and thereby knocked from the top of the car onto the ground, and run over by the engine, and permanently injured.

Such is a general summary of the situation and circumstances under which the accident occurred.

1. Error is assigned because the court admitted testimony tending to prove that the exhaust pipe in question might, at small cost and without injury to its efficiency, have been raised so as not to interfere with the defendant's employees riding upon the top of its freight cars. The reason given for such contention is that, as against the plaintiff, the defendant had the right to construct and locate the pipe as, in its judgment, would best accommodate its interest. The cases cited from this court in support of such contention all turn upon the assumption of risk, which will be considered later. *Naylor v. C. & N. W. R. Co.* 53 Wis. 661; *Casey v. C., St. P., M. & O. R. Co.* 90 Wis. 113; *Guinard v. Knapp, Stout & Co. Company,* 95 Wis. 482; *Osborne v. Lehigh Valley C. Co.* 97 Wis. 27; *Mielke v. C. & N. W. R. Co.* 103 Wis. 3. And yet in all these cases the duty of the master to furnish a reasonably safe place in which the servant may perform his labor is recognized. Thus, in the

last case cited, Mr. Justice BARDEEN, speaking for the whole court, said: " The proposition that it is the duty of the master to furnish the servant a reasonably safe place in which to perform his labors has been laid down so many times by this court that it is unnecessary to cite decisions to support it." The same is true of cases cited by counsel for the defendant from other states. *Shanney v. Androscoggin Mills,* 66 Me. 420; *Wormell v. M. C. R. Co.* 79 Me. 397; *Batterson v. C. & G. T. R. Co.* 53 Mich. 125; *Ragon v. T., A. A. & N. M. R. Co.* 97 Mich. 265. In the first of these cases it was held that, " It is the master's duty not only to provide suitable machinery for the use of the servant, and that which shall impose upon the servant no other or greater danger than is naturally incident to the business or employment, but to exercise all reasonable care in keeping it in the same condition." The last two cases recognize the same rule. This court has repeatedly held that in certain cases it was a question for the jury to determine whether a given structure was so near the track or so near a passing car as to render it unnecessarily dangerous to persons employed in operating the train. *Dorsey v. Phillips & C. Const. Co.* 42 Wis. 597, 598; *Bessex v. C. & N. W. R. Co.* 45 Wis. 477; *Hulehan v. G. B., W. & St. P. R. Co.* 58 Wis. 319; *Kelleher v. M. & N. R. Co.* 80 Wis. 584, 588; *Colf v. C., St. P., M. & O. R. Co.* 87 Wis. 273; *Paine v. Eastern R. Co.* 91 Wis. 340; *Kennedy v. L. S. T. & T. R. Co.* 93 Wis. 32; *Curtis v. C. & N. W. R. Co.* 95 Wis. 460; *Hennesey v. C. & N. W. R. Co.* 99 Wis. 109. In the first of these cases, RYAN, C. J., speaking of the custom of railroad companies to use such structures, said, " No custom, however uniform or universal, which unnecessarily exposes railroad employees to loss of life or limb, would seem to satisfy a duty which may be regarded as an implied condition of their charters." In that case the cattle chute was thirty-seven or thirty-eight inches from a vertical line from the track. In

Renne vs. The United States Leather Co.

the *Kelleher Case* the coal shed with which the plaintiff came in contact was twenty-two and one-half inches from the side of the mail car at its nearest point. In sustaining the verdict for the plaintiff in that case, this court said. "It is settled in this state that the duty of the company is to see that its tracks are not so obstructed as to render the duty of its employees unnecessarily hazardous." In the *Colf Case* the stub switch in the company's switch yard was so near the main track that its arm projecting at a height of two feet was only seven and one-half inches from the gangway step of the passing engine, where the plaintiff stood when injured, and two feet and seven inches from a vertical line from the nearest rail; and it was held that, as to employees working in the yard at night, the question of the defendant's negligence was for the jury.

It is undisputed that the exhaust pipe in question was, by actual measurement, fifteen feet and two and one-half inches above one of the rails directly under it, and a quarter of an inch nearer to the other rail. The height of the car in question, on the top of which the plaintiff was riding at the time of the accident, was twelve feet and five and one-half inches from the top of the rail to the top of the running board — in other words, it was two feet and nine inches from the top of that car to the exhaust pipe, and that car, which was a foreign car, was thirteen inches higher than the common box cars in use on the Wisconsin Central Railway (in other words, the top of the common box car in use on the Wisconsin Central was three feet and ten inches below the exhaust pipe in question); and such Wisconsin Central cars were the ones in general use in the defendant's yards. We must hold that there was no error in admitting the evidence complained of.

It follows from what has been said that there was no error in submitting to the jury, in the general charge, the question whether the defendant was in the exercise of ordinary care

in locating the exhaust pipe where it did, and, if the defendant was negligent in that regard, then whether such negligence was the proximate cause of the injury. The instructions of the court thereon appear to have been pertinent to the issue, and without any reversible error. The evidence on those questions is sufficient to support the finding of the jury to the effect that, by placing the exhaust pipe so near the top of such cars, the defendant made it unnecessarily hazardous for its employees riding upon the tops of such cars. There would seem to be no serious question but that such a structure, overhanging a railway track, under the circumstances mentioned, unobserved by a person riding upon the top of a freight car passing thereunder, would be dangerous to the person so riding.

2. The more difficult question is whether the plaintiff assumed the risk of such danger. It is undisputed that the plaintiff commenced work for the defendant in April, 1897; that he was employed as an errand boy to run errands, build fires, sweep out, and like chores, and that he should help the engineer, Payne, do the braking, *if he had time;* that he was sixteen years of age July 21, 1897, and hence two months and seventeen days older at the time of the accident; that prior to such employment by the defendant he had attended school eight months of each year, and worked on his father's farm, in the country, the balance of the time; that he weighed 144 pounds, but had never worked around railway stations or cars, or a sawmill, or farm machinery, or any machinery. The plaintiff testified to the effect that prior to the accident he had passed under the pipe on box cars seven or eight times — possibly ten times,— but that only two or three went upon the hide-house track, and they went further west than the chemical platform, where the car in question was to stop; that the other cars went on the other tracks to the bark sheds, still further west than the hide house; that he had never ridden upon the top of a car

Renne vs. The United States Leather Co.

under the pipe until the time of the accident; that, in all the switching he had done on the tracks running below the pipe, he had uniformly ridden on the side ladder until the car practically stopped, and then climbed to the top and set the brake, for the reason that it was new business to him, and he did not relish the idea of getting upon the top of a car when it was running fast; that he only did braking when not engaged in his regular work as an errand boy; that during July and August, 1897, he was engaged in haying for the defendant, and did not brake more than two or three cars; that he undertook to brake the car in question in pursuance of the request of the engineer to help place that car at the chemical platform, where it was to be stopped; that after getting the car from the Wisconsin Central tracks, and having it weighed, and the plaintiff opening the hide-house switch, forty-eight feet east of the pipe, as mentioned, the car was backed west by the engine, and about the same time that it started the plaintiff got onto the car at its north-west corner, where the ladder was; that as he got onto the ladder the car moved west rapidly — he should judge, as fast as a man could run; that he knew he had to be at the brake on the top of the car, at the southeast corner thereof, to set the brake and stop the car when it reached the chemical platform; that, after going up the ladder to the top of the car, he crawled on his hands and knees to near the middle of the car, and then started to walk east, fast, to the brake; that he did not know how far he got when he became un-conscious — did not remember being struck, ceased to remember anything; that while so walking toward the brake he was thinking of setting it and stopping the car; that he did not think anything about the exhaust pipe, or about its being there, at the time; that he knew it was there, but never thought much about it; that he did not know how high that pipe was above the car, and did not then know whether the car was of ordinary height, or higher than usual; that he

had never watched the speed of cars with reference to this pipe, or made any observations as to how soon it would get under the pipe, considered from any particular point; that he had not been cautioned or given any instruction about that pipe, or the care to be used in going under it, or how far it was above the ground.

Such testimony of the plaintiff, or a considerable portion of it, was corroborated by other evidence. One witness, who saw the plaintiff when he was struck by the pipe, testified that the plaintiff had just straightened up, and was about eight feet from the east end of the car, when he was struck just about across the shoulders by the pipe; that as the pipe hit him he threw up his arms, and was pushed headfirst over the end of the car. It appears that the track at and near the hide house was nearly level, and that the same was true of the other track at and near the bark shed, but that at or near the chemical platform the grade was at the rate of two feet in every 100 feet.

Upon such evidence, can we say, as a matter of law, that the plaintiff assumed the risk? In other words, Did such evidence justify the court in charging the jury as follows: The plaintiff "certainly knew the pipe was there. Any person would know that if he were on top of a rapidly moving box car, and came in collision with this pipe, he would be in danger. But did plaintiff know, or have such means of information as would charge him with knowing, the precise relation of the pipe to the track, to the box car, its distance from the box car, and the danger of passing under on such a car? If he did not know or have means of knowing these facts, and, from youth or inexperience, could not reasonably be expected to know them, and was not sufficiently warned of the danger, he would not be held to assume the risk of his employment. So, in these instructions as to the dangers which the plaintiff knew or ought to have known, I think you should not only consider that he knew the pipe was

there, and that if he collided with it he would be injured,
but you should inquire whether he appreciated, or ought to
have appreciated, the precise danger,— the relation of the
pipe to the track, to the box car, and its distance from the
box car, and the danger of passing under, on such a car"?
The exception to the last portion of such instructions is es-
pecially relied upon. In the *Dorsey Case* cited (42 Wis.
597), Chief Justice RYAN said: "If he [the plaintiff] knew,
or ought reasonably to have known, the *precise danger* to
him, in the course of his employment, of the cattle chute in
question, and saw fit, notwithstanding, to continue in his
employment, he might be held to have assumed the extraor-
dinary risk, as well as the ordinary risks, of his service.
. . . But it appears to us that this consequence of ac-
quiescence ought to rest upon positive knowledge, or rea-
sonable means of positive knowledge, *of the precise danger
assumed*, not on vague surmise of the possibility of danger.
And there might be serious difficulty in applying the prin-
ciple to a case like this. The safety of railroad trains de-
pends largely upon the exclusive attention of those operating
them to the track and to the trains themselves." Pages 598,
599. Such language has been frequently quoted, or referred
to approvingly, in later cases in this court. *Nadau v. White
River L. Co.* 76 Wis. 132; *Haley v. Jump River L. Co.* 81
Wis. 426; *Colf v. C., St. P., M. & O. R. Co.* 87 Wis. 276;
*Luebke v. Berlin Machine Works*, 88 Wis. 448; *Kennedy v.
L. S. T. & T. R. Co.* 93 Wis. 39. Such rules have been re-
peatedly applied by this court to adults with more or less
experience. Certainly the rule should not be less favorable
to a youth of the plaintiff's age and limited experience, in-
jured under the circumstances detailed. As indicated, he
was only expected to do the braking in case he had time
from his regular work of running errands, building fires,
sweeping out, and doing similar chores. True, he knew
that such pipe was suspended over the track, but he did not

know its height from the track, nor the distance from the pipe down to the top of an ordinary box car — much less, from the pipe down to the top of the car in question,— nor whether that car was different in height from ordinary box cars; and he had never been on the top of such a car while passing under such pipe before, nor attempted to set the brake on a car to be stopped at the chemical platform before, and he had never observed the speed of such cars with reference to such pipe. Under the circumstances of this case, and the repeated decisions of this court, we think the trial court properly refused to hold, as a matter of law, that the plaintiff assumed the risk, and properly submitted to the jury the question whether the plaintiff appreciated, or ought to have appreciated, the precise danger of riding upon the top of such car while passing under such pipe.

Counsel for the defendant seem to think that the jury were misled by the use of the words "appreciated the precise danger," in the portion of the charge quoted. The words "precise danger" were manifestly taken from a portion of Chief Justice RYAN's opinion in the *Dorsey Case* (42 Wis. 597), quoted above. They are there used to distinguish ": the extraordinary risk" to which the plaintiff was subjected from " the ordinary risks of the service." As used in the charge in the case at bar, they are explained, as applicable to " the relation of the pipe to the track, to the box car, and its distance from the box car, and the danger of passing under on such a car." They simply called the attention of the jury to the particular danger of the plaintiff being knocked off the car by the pipe while on the top of the car, as distinguished from dangers generally by reason of working in the defendant's yards, and hence were used to prevent the jury from being misled.

There was no error in submitting to the jury the question whether the plaintiff " appreciated, or ought to have appreciated," such danger. To appreciate such danger was " to

be fully aware of" such danger,— to know or comprehend such danger. In the *Dorsey Case*, Chief Justice RYAN suggested a similar thought in respect to an adult with a considerable experience, by the use of the words "positive knowledge." That a boy of the plaintiff's age at the time of the accident would be less likely to know, to comprehend, to be fully aware of, such danger, than a person of mature years, goes without saying, and has often been recognized and sanctioned by this court. *Jones v. Florence M. Co.* 66 Wis. 268, 277, 278; *Neilon v. Marinette & M. P. Co.* 75 Wis. 579, 585, 586; *Nadau v. White River L. Co.* 76 Wis. 120, 129; *Chopin v. Badger P. Co.* 83 Wis. 192, 196–198; *Thompson v. Johnston Bros. Co.* 86 Wis. 576; *Luebke v. Berlin M. Works*, 88 Wis. 442, 448, 449; *Wolski v. Knapp, Stout & Co. Company*, 90 Wis. 178; *Kucera v. Merrill L. Co.* 91 Wis. 637, 643; *Egan v. Sawyer & A. L. Co.* 94 Wis. 137; *Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277. In charging the jury upon that subject the court, among other things, said: "If you find that the nearness of this overhead steam pipe to the top of a box car passing under it was a danger to which the plaintiff was exposed in the performance of his duty while braking, and that it was danger which was known and comprehended by him, or was such an open or obvious danger as that, considering his age, intelligence, experience, judgment, and discretion, he ought, in the exercise of reasonable and ordinary care, to have known and appreciated it, then the law is that the plaintiff assumed the risk of such danger, and that he cannot recover." With the uncertainties mentioned, and the constantly changing conditions by reason of the movement of the car and the ascent of the grade, the court was fully justified in giving the portion of the charge quoted.

3. From what has been said, it is obvious that the trial court was justified in submitting to the jury, with appropriate instructions, the question whether the defendant was

negligent in failing to sufficiently instruct or caution the plaintiff as to the danger of riding upon the top of a car while passing under the pipe. In charging the jury upon that subject, the court said, in effect, that the jury should consider the plaintiff's age, and the statements made to the defendant's superintendent by the plaintiff's brother-in-law when application was made for the position for the plaintiff to work, to the effect that the plaintiff was nearly eighteen years of age. The evidence is pretty strong that the plaintiff had received general instructions about switching and coupling cars, and the defendant's engineer testified that he had warned him to keep off from the top of such cars while in motion; but the plaintiff flatly contradicts such statement, and we must hold that the evidence is sufficient to support a finding that he was not warned to keep off the top of such car or cars while passing under the pipe.

4. It is contended that the undisputed evidence shows that the plaintiff was guilty of contributory negligence. This is based upon the assumption that he knew the height of the pipe above the track and above the car; that upon former occasions he had ridden upon the ladder at the side of the car until it passed under the pipe, and reached to or near its place of destination, before going upon the top to set the brake, and that in the case at bar he went upon the top of the car before it passed under the pipe, and then failed to remember the overhanging pipe, so as to avoid being struck by it. In support of the verdict in favor of the plaintiff, we are required to consider the evidence in his behalf in the most favorable light it will legitimately bear. *Townley v. C., M. & St. P. R. Co.* 53 Wis. 626; *Kaples v. Orth,* 61 Wis. 531, 533; *Adams v. C. & N. W. R. Co.* 89 Wis. 645. According to such evidence, it appears that all other cars which passed under the pipe, and upon which he set the brakes, were destined to places considerably west of the chemical platform, and where the grade was comparatively level, and

Renne vs. The United States Leather Co.

hence no necessity of being at the brake until the car practically stopped; that he had never before ridden upon the top of such a car, under the pipe, for the reason that it was new business to him, and he did not relish riding upon the top of such a car while in rapid motion; that the switch which the plaintiff turned was only forty-eight feet east of the pipe, and the chemical platform, where he was to set the brake and stop the car, was only 120 feet west of the pipe; that the car moved fast up a rapidly ascending grade, and was to be stopped on such grade; that he did not know that the pipe was so near the top of the car as to hit him while in the act of setting the brake. The difficulty of a nonexpert, standing upon the ground, accurately judging the height of a pipe thus suspended in the air, especially when viewed from a lower grade, is apparent. Manifestly the plaintiff was intently absorbed in the thought of setting the brake under circumstances which he had never before encountered, but that would be no excuse if he had actually assumed the risk. We must hold that the finding of the jury that the plaintiff was not guilty of contributory negligence is sustained by the evidence.

5. It is contended that the damages are excessive. The plaintiff was injured between four and five o'clock in the afternoon of Friday, October 8, 1897, and remained unconscious until the following Sunday, but his recollection of what occurred on the day of the accident and before did not begin to come back to him until about two weeks after the injury. The medical testimony tends to prove that when he was found, after the accident, his right arm was nearly severed between the shoulder and the elbow,— a little nearer to the shoulder than the elbow; that that arm was at once amputated about two inches below the shoulder joint, and dressed; that the left arm was dislocated at the elbow; that the ulna was dislocated backwards and downwards; that the radius was dislocated from the ulna, up-

wards and forwards; that there was great difficulty in reducing the dislocation of the radius, on account of its being fractured on the wrist, and hence they had no chance to pull; that the radius was also broken, and they set the radius and put the whole arm in splints; that there was a cut by some sharp instrument on his head to the skull, about an inch long, which they sewed up, putting in about three stitches; that the left arm was badly used up; that the chances for the arm looked worse after a day or two; that it was badly swollen at the elbow and discolored, and very painful; that, in order to keep the radius in place, it had to be put in a straight splint temporarily; that it pained so they took that off and put on short splints, in order to get a little flexion at the elbow; that the arm was swollen quite badly; that it was placed in a box to fit the arm; that subsequently all the splints were taken off, and the arm was put into a plaster of paris cast from the wrist nearly to the shoulder; that when that got dry they split the cast to the elbow, to permit a little movement in the joint; that it pained so that they cut a large hole right over the fracture, and found it swollen and discolored; that the skin broke, and matter escaped, caused by the fracture of the bone and the tearing of some of the soft tissues around it at the time of the accident; that the worst trouble was in the elbow; that during such treatment he was troubled with a want of sensation in his hand,— did not have any feeling in his fingers, and had no use of them; that he first began to use his thumb, then the little finger and the one next to it, but not either of the other two; that he had difficulty in passing his urine, and had to use a catheter for several days; that he complained a great deal about his aches and pains; that he was able to be up and around four or five weeks after the injury; that at the time of the trial, which was eighteen months after the injury, the arm was smaller than before a short distance above the wrist joint, and larger than formerly

further up; that the wasting away of the tissues would cause it; that, if that was the cause, that would indicate that there had been an injury to the nerves, and possibly to the circulation supplying those muscles; that the bone itself had united; that the elbow joint was in pretty fair shape — more movement to it, and the fingers were better — more use of them; that they did not think the arm would ever be as good as before, and could not say whether or not he would be able to use it for ordinary purposes, as helping himself at the table, dressing himself, writing, or doing light work; that the arm did not look unhealthy. Another doctor testified that he found a grating sound in the joint between the radius and the ulna, due to chronic inflammation in that joint, which, in his opinion, would be a permanent defect in that joint; that the effect of deep-seated inflammation upon the nerves was to lessen the functional activity of the nerve cells and nerve fibers, and was liable to cause degeneration of the nerves and produce paralysis; that, in his opinion, the arm would never improve. Another physician, in answer to a hypothetical question, testified to the effect that the trouble about passing urine would indicate either a local cause in or about the bladder, or some disturbance in the portion of the spinal cord upon which the functions of the bladder depended, or it might result from injury to the brain. It appears that prior to the injury the plaintiff was healthy, and weighed 144 pounds, and was receiving $1 per day, and at the time of the trial was in as good health as could reasonably be expected under the circumstances. Upon the subject of damages the court charged the jury that, if they found for the plaintiff, they might include, as damages, not only his physical and mental pain and suffering, but also such sum as would compensate him for such diminished earning capacity in the future, after reaching his majority, as they should find from the evidence was reasonably certain to result from his injuries.

Renne vs. The United States Leather Co.

Of course, it is very difficult to measure pain and suffering with money. But the legal measure of damages must necessarily be based upon some practical pecuniary basis. In our judgment, the evidence in the case, and the rules of law stated, did not authorize the jury to return so large a verdict as they did. Twenty thousand dollars, at interest, would enable the plaintiff to receive annually several times. more than he was earning, without touching the principal. Of course, he is entitled to be fully compensated for such pain and suffering, as well as for his diminished earnings. In view of the former rulings of this court, we are forced to the conclusion that the damages assessed by the jury in this case are largely in excess of what was warranted by the law and the evidence. *Heddles v. C. & N. W. R. Co.* 74 Wis. 259; *S. C.* 77 Wis. 228, 235; *Waterman v. C. & A. R. Co.* 82 Wis. 613, 638; *Donovan v. C. & N. W. R. Co.* 93 Wis. 373, 377; *Taylor v. C. & N. W. R. Co.* 103 Wis. 27, 32; *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 333–336; *Crouse v. C. & N. W. R. Co.* 104 Wis. 473, 486.

*By the Court.*— By reason of such excessive damages, the judgment of the circuit court is reversed, and the cause is. remanded for a new trial, but with the option on the part of the plaintiff, to be exercised within thirty days after the filing of the *remittitur* from this court in the trial court, to remit, in writing, from the verdict, all damages in excess of $12,000, and file such remission with the clerk of the trial court, in which event judgment is to be entered thereon for the amount stated, as damages, and the costs and disbursements in the circuit court.

MARSHALL, J. The most important question presented by this appeal is, Was the evidence sufficient to carry the case to the jury as to whether *Renne* knew or ought to have known of the danger of standing on a box car while it was passing under the exhaust pipe? It seems that such

question should be answered in the affirmative, and that
the trial court and this court reached a different conclu-
sion by giving weight to evidence so at variance with
conceded facts as not to raise a conflict therewith for the
consideration of the jury. The testimony referred to is to
the effect that *Renne*, while walking in an upright position
on the running board of the car, was struck by the exhaust
pipe in the region of his shoulders, and that the car was
thirteen inches higher than ordinary cars, such as he was
familiar with and had often assisted in operating under the
pipe. Significance was given to that testimony by the trial
court in the instructions to the jury, and special significance
was ascribed to it by my brethren, as will be seen by refer-
ence to the opinion of the court, the idea evidently being
that such testimony warrants a belief that the pipe was high
enough to have cleared, or nearly cleared, the boy's head if
he were on an ordinary car, and that it was so near the
boundary line between danger and safety as not to be, as
matter of law, obviously dangerous to a boy of *Renne's* in-
telligence and experience.

The conceded facts above referred to are stated in the
opinion of the court in substance as follows: The pipe was
thirty-three inches higher than the running board of the car
on which *Renne* was riding when injured and forty-six inches
higher than the running board of an ordinary car. Such
facts, in connection with the undisputed evidence that the
boy was five feet nine inches tall and weighed 144 pounds —
a man, almost, in stature and physical development — show
conclusively that the testimony indicating that the exhaust
pipe was as high as his shoulders as he was walking on the
running board of the car, is not entitled to any consideration,
leaving no room for belief that the boy could have failed,
had he exercised reasonable attention to his surroundings
during the months prior to his injury, to have known that
the pipe was too low to admit of his safely passing under it

standing on any box car. Instead of the pipe being high
enough to about clear *Renne's* head while he was walking
upright on an ordinary box car, it was about two feet lower,
and instead of its being as high as his shoulders, as he was
walking on the running board of the large car, it was about
as high as the upper part of his thighs. The testimony re-
ferred to, which was considered by the lower court and jury
and by this court, and which led to the result complained
of, plainly is not entitled to any credence whatever. It
should have been disregarded. *Badger v. Janesville C. Mills,*
95 Wis. 599; *Roth v. S. E. Barrett Mfg. Co.* 96 Wis. 615;
*Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352.

From what has preceded it seems that in deciding the con-
troversy of whether there was evidence to warrant a finding
that *Renne* knew, or ought to have known, the dangers in-
cident to his employment, as the work was being carried on,
occasioned by the location of the exhaust pipe, we must face
the fact that such pipe would have been two feet lower than
the top of his head if he had been standing at the time of
his injury on such a car as those with which he was per-
fectly familiar and had often assisted in operating under it.
In that view we venture to say that there can be but one
reasonable conclusion: A boy of ordinary comprehension,
of the age of *Renne*, possessed of his experience and circum-
stanced as he was for months before his injury, could not
reasonably have failed to have observed the dangerous loca-
tion of the pipe. It was but about two thirds of the boy's
height above the running board of an ordinary car. To safely
pass under it, standing on such running board, he would
necessarily have been required to have bent his body down
at an angle of over 45°. A situation so dangerous as that
could not reasonably escape the notice of any sixteen-year-
old boy capable of working at the handling of cars if he paid
any reasonable attention to his surroundings.

It follows, in my judgment, that *Renne* knew, or was

clearly guilty of a want of ordinary care for not knowing, the dangers of his employment, caused by the exhaust pipe, and that his attempt to pass it on the occasion of his injury, regardless of such dangers, is attributable wholly to his forgetfulness, for which on legal principles he alone is responsible.

BARDEEN, J.   To my mind, the danger which menaced the plaintiff was so open and obvious, and so well known to him, that it should have been held, as a matter of law, that he assumed the risk of accident.   No warning that the defendant could have given him would have made it more apparent.   He simply forgot the existence of the pipe, and his forgetfulness cannot be charged to the defendant.   The real inquiry was, Did plaintiff know, or ought he, under all the circumstances, reasonably to have known, that there was danger of accident from the proximity of the pipe in question to the top of the car?   If he did, then he assumed the risk, and all the discussion over "knowledge of the precise danger" and "appreciation of the risk" leads to confusion, rather than enlightenment.   I agree that the damages are excessive.

A motion for a rehearing was submitted for appellant on the brief of *Cate, Sanborn, Lamoreux & Park*, attorneys, and *Geo. W. Bird*, of counsel.

Motion denied September 5, 1900.