Muska, Respondent, v. Economy Block Company,
Appellant.

*January 7—February 2, 1960.*

For the appellant there were briefs by *Shaw, Muskat &
Paulsen* and *Adolph I. Mandelker* and *John H. Wessel,*
attorneys, and *John G. Quale* and *Jack R. Wiedabach* of
counsel, all of Milwaukee, and oral argument by *Mr. Quale*
and *Mr. Wiedabach.*

For the respondent there was a brief by *Goldberg, Previant & Cooper* of Milwaukee, and oral argument by *Albert
J. Goldberg.*

DIETERICH, J. The sole issue presented on this appeal is whether any of the credible evidence in this case will sustain the jury's finding of negligence on the part of the truck driver, employee of the Economy Block Company. No issue is raised as to the matter of damages.

On August 2, 1954, about 1:30 or 2 p. m., Herbert Muska suffered a back injury while engaged in lifting and pushing a concrete lintel from a delivery truck onto the second-floor deck of a partially completed commercial building located at North Seventy-Second and West Burleigh streets in the city of Milwaukee. He was employed as a mason by Acme Construction Company, one of the contractors engaged in erecting the building.

A lintel is a rectangular block of solid concrete used in connection with windows and doorways to support surrounding brickwork. The particular lintel was 10 feet in length, eight inches high by four inches wide, and weighed between 300 and 400 pounds. This lintel along with several others had been delivered to this jobsite by a truck driver for appellant, Economy Block Company. The truck was backed in a southerly direction to the building. The lintels were piled lengthwise on the floor of the truck with the tail gate extended, and were piled with the eight-inch side vertical and the four-inch side horizontal. The truck box was about eight feet in length and the tail gate extended another 20 inches.

The truck platform was 18 to 20 inches from the ground level and was backed up almost even with the north edge of a scaffold abutting the north side of the building. The scaffold rings were five feet high and five feet wide and have three 12-inch planks laid horizontally on them.

Herbert Muska and the truck driver commenced to lift the south end of the first lintel, each standing on the opposite sides and facing each other, the eight-inch side of the lintel being in a vertical position. They proceeded to lift and slide

the south end of the lintel off the truck until it rested on the edge of the scaffold which was about three and one-half feet higher than the truck platform. The north end of the lintel remained on the truck platform.

Then they climbed onto the scaffold and again grabbed hold of the south end of the lintel in the same fashion and slid the lintel southward and upward until about one foot of the south end rested on the edge of the second-floor deck, the north end still resting on the truck platform. The north edge of the second-floor deck was about eight feet from the truck platform. Muska and the driver then proceeded to climb down and return to the truck platform for the purpose of lifting the north end of the lintel and pushing or sliding it up to the second-floor deck. Muska is five feet, nine inches tall and the driver is about six feet tall. Each grabbed the north end of the lintel on opposite sides, facing each other. Muska was standing directly on the truck platform, whereas the driver was standing on top of other lintels and his feet were thus eight inches higher in elevation. Both men lifted the end upward, and Muska extended his arms fully in a vertical position. The driver, because of his height and the fact he was standing on eight-inch lintels, was about 11 inches higher than respondent and did not have his arms fully extended vertically. While in this position and in the process of sliding the lintel southward, the respondent was injured.

*Testimony of Herbert Muska—direct.*

"*Q*. Now, where were you standing when you were raising this lintel? *A*. I was standing on the truck platform where the lintel had been moved from. . . .

"*Q*. Were you being helped by anybody at that time? *A*. Yes, by the driver of the truck.

"*Q*. Where was he standing? *A*. He was standing on the opposite side of me, on top of the lintels that were left on the truck. . . .

"*Q*. Then what did you do? *A*. We bent down and picked it up, and we had our arms stretched. I had my arms stretched full length, as high as they would go.

"*Q*. Where on the lintel were your hands? *A*. Near the back. I would say within about six inches of the back of the lintel or the bottom of the lintel which was picked from the truck.

"*Q*. Where were his hands? *A*. He had one on one side of mine and one on the other side, if I recall right.

"*Q*. Now, will you describe this position again you told us you were in? *A*. I had my arms stretched the full length what I could about my head.

"*Q*. . . . where was the south end of the lintel, the farthest end from you? *A*. That was resting on the second-story deck.

"*Q*. Was the very end resting on it or what part? *A*. No, I would say it had about a foot slant, something like that.

"*Q*. In other words, about a foot of the lintel was beyond the edge of the deck, is that right? *A*. Yes.

"*Q*. In relation to the deck of the second story, where was the end that was closest to you? *A*. I would say that was about a foot lower than what the deck would be.

"*Q*. All right, now, when you had this in this position, with your hands you said about six inches from the end. *A*. Yes.

"*Q*. The south end of the lintel a foot over the edge—beyond the edge of the platform. *A*. Yes.

"*Q*. And the other end about a foot—how far did you say, six inches to a foot? *A*. I would say from six inches to a foot slant to it.

"*Q*. Lower than the edge. In that position, what happened? *A*. Somehow or other, he left go for a short period. In doing that, I weaved back, then I weaved ahead. Then he got his hold again on the lintel.

"*Q*. What do you mean it weaved? *A*. When he left go or something somehow, the full weight, it weaved me; it swayed me; I swayed back and swayed ahead, and he caught hold of it again.

"*Q*. You say the full weight of what? *A*. The lintel.

"*Q.* Did you notice anything happen when that happened? *A.* Yes, it was just like if you took and ripped a newspaper in two is what it sounded like. I had pain right away, but I didn't think too much of it.

"*Q.* Where was the pain? *A.* Just below the belt line in my back.

"*Q.* Will you describe this pain, the intensity, what kind of pain was it? *A.* It wasn't—I wouldn't say a sharp pain, but it was a pain. It weakened me, and I'm weakened right now from it.

"*Q.* What did you do then? *A.* We worked that lintel onto the deck.

"*Q.* How? *A.* By sliding it.

"*Q.* . . . When you say you were sliding it, were just the two of you sliding it at that point? *A.* At that time, yes, but then we got it up a little further, I would say about three inches more or so, then the guy on top took hold and helped.

"*Q.* What was his name? *A.* Jack Jones.

"*Q.* He did what? *A.* Helped pull it on.

"*Q.* From in front? *A.* Yes.

"*Q.* Where was he? *A.* He was on top, on the second deck.

"*Q.* After you got this one lintel on, how did you feel? *A.* We tried to put the next one up. I couldn't lift it. I couldn't lift my share to help get it up.

"*Q.* Why is that? *A.* Due to the pain in the back already.

"*Q.* What did you do about the other lintels? *A.* Just then the superintendent of the job came up. I told him I had to have help, that I had hurt myself.

"*Q.* What did he do? *A.* He went and got another man right away from another crew.

"*Q.* How did you operate after that? *A.* I couldn't lift them no more. Then we laid a plank from the second story down onto the truck, and we slid them up on that with a rope.

"*Q.* How did you feel during this time? *A.* I was sore but I didn't mind it too much. I kept moving. I was getting sorer as the day progressed on.

"*Q.* Did you continue working the rest of the day? *A.* I worked. I didn't do any lifting or any manual work no more. After we had the lintels off, I more or less just showed the laborer what was to be done. . . .''

Herbert Muska, called as an adverse witness by the defendant, testified:

"*Q*. You claim you and the truck driver put the south end of the lintel up onto the scaffold, and the north end then was resting in the truck. *A*. Yes.

"*Q*. And that then you and the truck driver got into the truck and lifted it up, is that right? *A*. No.

"*Q*. What did I leave out? *A*. From lifting it onto the scaffold, we got from there onto the scaffold and put it onto the deck.

"*Q*. After you had it up on the deck, then you had it up, then you got into the truck. *A*. Yes.

"*Q*. As I recall your testimony was you were standing with your arms extended like this, is that correct? *A*. Yes.

"*Q*. Let's assume we are moving south; this is where the lintel is; it is up on the second deck, right? *A*. Yes.

"*Q*. Now, about what position was the truck driver supposed to have been in? *A*. I would say he had his hands about like this, at that point.

"*Q*. He was facing you here? *A*. Yes.

"*Q*. Then did you see his hands come off the lintel? *A*. Yes.

"*Q*. Let's assume you got the lintel here. About how far down did his hands come that you saw? *A*. They freed the lintel.

"*Q*. About how far? One inch? Two inches? . . . *A*. I would say an inch. . . . Something like that. I ain't sure, but I would say something like that.

"*Q*. Were you watching his hands like this or were you watching where you were guiding it? *A*. No, you watch where you are watching.

"*Q*. You were watching here; you were watching his hands. *A*. And my hands also.

"*Q*. So you would know whether his hands came off the lintel. *A*. Yes.

"*Q*. As you were standing there holding this, you saw his hands come off the lintel, is that right? *A*. Yes.

"*Q*. Mr. Muska, I call your attention to the examination held of you on July 7, 1956, before Court Commissioner

John Fleming, . . . Would you listen to see if these questions were asked of you and whether you gave these answers:

"'Q. Then what happened? A. He shifted his feet and that shoved the weight all onto me and I fell back.

"'Q. Did you fall off the truck? A. No.

"'Q. Did he take his hands off the lintel? A. His hands didn't exactly come off, but he did lose his grip, he didn't have his grip for a second or so.'

"Q. That would indicate here you indicated his hands didn't come off the lintel, but now you testified that you saw his hands come down about an inch. I am just wondering what is the fact? Did you see his hands come down or did he just lose his grip? A. *His hands came down.* [Emphasis supplied.]

"Q. When you were asked that question whether his hands came off the lintel, you stated in answering that question that his hands didn't come off the lintel. A. It maybe was put up to me in this way. I wouldn't know which way it was put up to me.

"Q. Did he take his hands off the lintel? A. His hands didn't exactly come off, but he did lose his grip, he didn't have his grip for a second or so.

"Q. Would you describe the truck driver of Economy Block who brought the lintels this day? A. Well, as close as I can remember, he was built something like I am, but he was taller than I was. Outside of that, I can't give you much more of a description on him.

"Q. What did he weigh? A. I could not tell you.

"Q. How tall was he? A. He was taller than I was. . . .

"Q. . . . at the time you got your arm stretched like this, did you happen to notice where the truck driver was standing? A. Then, no, I didn't see his feet.

"Q. Was he standing on the truck or was he standing on the lintels? A. When we picked up the lintel, he was standing on the lintels.

"Q. When you picked up the lintel, he was standing on the lintel. That lintel is eight inches high, isn't it? A. Yes.

"Q. So he would be eight inches higher than you. A. Yes.

"Q. And you say he was about six feet tall? A. Yes.

"*Q*. Just standing on the lintel, he would be 11 inches higher than you, wouldn't he? *A*. Yes.

"*Q*. Mr. Muska, I am referring to the adverse examination taken on June 15, 1956. . . .

"'*Q*. How high did you get this lintel off the truck platform when you claim something happened? *A*. An arm's length stretched out.

"'*Q*. Stretched out above your head? *A*. Yes.

"'*Q*. In other words, you had it up at least six feet off the platform of the truck? *A*. Higher than that.

"'*Q*. Seven feet? *A*. Well, I am five foot nine; close to seven and a half, eight feet up in the air.

"'*Q*. That was about as high as you could reach? *A*. That is right, an arm's length stretched out.

"'*Q*. And the other fellow was reaching the same way? *A*. Yes.

"'*Q*. I assume that this lintel was balancing on the edge of the building, wasn't it? *A*. Yes, the front of it was on the edge, maybe stood over a foot or more onto the building in the front, yes.

"'*Q*. And Jones had hold of the other end by that time, didn't he? *A*. Yes.'

"*Q*. Now, when you stated that the other fellow was reaching the same way that you were, were his arms stretched out like this or were they down like this? *A*. They were down more.

"*Q*. But at that time you indicated he was reaching the same way you were. *A*. No, I didn't say he had his arms stretched out full length like I did. When you come above your head with anything, you are reaching. . . . When your hands get above your head, you're absolutely reaching at any point then."

*Testimony of Herbert Muska—redirect.*

"*Q*. Now, Mr. Muska, you saw the man who testified this morning who stated he had delivered those lintels? *A*. Yes.

"*Q*. Was that the same man who you maintain was unloading those lintels with your aid at the time you claim you were injured? *A*. No, sir.

"*Q*. You identified the man who did it as being heavier than you, didn't you? *A*. No, I didn't identify him heavier.

"*Q*. You identified the man as being six feet tall, didn't you? *A*. Yes."

*Testimony of Robert Dittsworth, truck driver,—direct.*

"*Q*. Did you receive any help in the unloading, taking the lintels off the truck? *A*. Yes, sir, one man helped me.

"*Q*. What if anything was the other man doing while you were placing the lintels on the cement blocks on the ground? *A*. He was up on the second floor of the building. . . .

"*Q*. Would you describe the manner in which the lintels on August 2, 1954, were taken off the truck and placed on the cement blocks? *A*. Yes. We pulled the lintels back to the back of the truck so they rested on the tail gate. Then I got up next to the truck and took hold of the end of the lintel that was on the truck. The helper helping me was on the other end. We carried them over and laid them on the concrete blocks.

"*Q*. Would you state whether or not any lintel, in the manner you delivered them on this particular date, slipped out of your hands? *A*. No, sir.

"*Q*. Would you state whether or not the helper who was assisting you in unloading these made any complaint to you that the lintel had slipped out of your hands? *A*. No, sir.

"*Q*. Would you state whether or not the helper who assisted you in removing these lintels from the truck made any statement to you that he had hurt his back in the course of unloading the lintels? *A*. No, sir."

The testimony discloses that there is a factual issue presented as to whether the conduct of the truck driver constituted negligence. We cannot say as a matter of law that the sudden transfer of weight by one of the two handling the lintel weighing 300 to 400 pounds is or is not negligence, but it can be negligence.

The trial court in its written opinion on motions after verdict stated that:

"The jury was instructed as to what negligence is and further that in order to find for the plaintiff, the plaintiff had to satisfy them by a fair preponderance of the evidence that the defendant's agent was negligent."

The jury had the right to accept Mr. Muska's description of the event, and that the truck driver-agent of the Economy Block Company took his hands off of the lintel without using due care.

The credible evidence and all reasonable inferences to be drawn therefrom were clearly matters for the jury's determination and the record is adequate to sustain its findings. *Blakeslee v. Rossman* (1878), 44 Wis. 550; *Kaples v. Orth* (1884), 61 Wis. 531, 21 N. W. 633; *Renne v. United States Leather Co.* (1900), 107 Wis. 305, 83 N. W. 473; and *Braatz v. Continental Casualty Co.* (1956), 272 Wis. 479, 76 N. W. (2d) 303.

*By the Court.*—Judgment affirmed.

MARTIN, C. J., and BROADFOOT, J., dissent.